

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00003-CV

---

PETROHAWK PROPERTIES, L.P.,
AND P-H ENERGY, L.L.C., Appellants

V.

NOEL DIANE JONES, ET AL., Appellees

---

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 11-0849

---

Before Morriss, C.J., Moseley and Carter,* JJ.
Opinion by Justice Moseley

---

*Jack Carter, Justice, Retired, Sitting by Assignment

# O P I N I O N

## I.    Background

In 2008, oil and gas companies descended on east Texas and Louisiana seeking to acquire leases to exploit the Haynesville Shale formation, which they viewed as having enormous potential. The atmosphere created by these companies was described as "unreal," "a land rush," and comparable to a gold rush. David Deffenbaugh, Petrohawk Properties, L.P.'s, vice president of land—midcontinent at the time, testified that in his thirty years in the industry, he had never seen bonus prices and activity accelerate as quickly as it did during the Haynesville Shale heyday.

To identify mineral interests that were available to lease, it was necessary to employ landmen to conduct title searches in the local county clerks' offices. In Harrison County, the clerk's office was overwhelmed with 80–100 landmen, causing the deputy clerks to limit the time each landman could use the office computers. This made it almost impossible to finish the title searches in a timely fashion.

During this time, Petrohawk[1] was in heated competition with other companies to acquire acreage in the Haynesville Shale; because of the contests among the oil companies to acquire leases, the lease bonuses[2] shot up from around $200.00 per acre to a high of $30,000.00 per acre. Petrohawk engaged in an aggressive leasing program, seeking to gain leases as quickly as possible in what its land manager, John Walsh, described as "a short . . . window of time."

---

[1]Appellants are collectively referred to as Petrohawk.

[2]"Bonus" is a term applied to the consideration paid for a lease of the oil and gas mineral estate over and above the royalty. *State Nat'l Bank of Corpus Christi v. Morgan*, 143 S.W.2d 757, 760 (Tex. 1940).

Petrohawk hired RWT Land Services (RWT) to identify mineral interests in the Haynesville Shale formation available to lease; research the titles to the mineral interests; and identify any title defects, liens, or other encumbrances associated with those interests. The landman in charge of the project for RWT was Brent Chadwick. One way to acquire leases of substantial acreage in the shortest period of time was to identify landowners having large quantities of mineral interests in the Haynesville Shale stratum that were not subject to prior leases. RWT identified the Appellees and their family members[3] (collectively, the Family) as owning substantial available mineral interests.[4]

Negotiations began in June 2008 between the Family and RWT, acting on behalf of Petrohawk, for Petrohawk to lease the Family's available mineral interests. As negotiations progressed, Petrohawk's executive vice president, Steve Herod, became directly involved in finalizing the contract. The Family was willing to enter into a lease for an amount that was not the highest price per acre being paid by some other oil companies so long as the lessee would agree to lease every "open" mineral interest in the area (i.e., all of the minerals in which the Haynesville Shale depth stratum was not subject to a prior lease) held by the Family. Petrohawk and the Family entered into the "Agreement to Lease Oil and Gas Mineral Interests" (the Agreement) on July 11, 2008.

---

[3]There were twenty-four family ownership interests (including individuals, trusts, partnerships and estates). Only twelve are Appellees in this case.

[4]Appellees and their family members are descendants of either T.P. Smith or T.C. Lindsey, who were partners in a Harrison County general store in the early 1900s called the "Smith & Lindsey" store. Local landowners trading at the store at times traded interests in land, including mineral interests, in lieu of cash, resulting in the acquisition of mineral rights by the Family in approximately 100 tracts scattered around Harrison County.

The Agreement provided that Petrohawk, within specified limitations, would lease all of the Family's unleased mineral interests situated east of Highway 59 in Harrison County, Texas (including, but not limited to, an extensive list of properties attached as Exhibit A to the contract), provided that the interests included rights in the Haynesville Shale stratum and, if unleased, the Bossier Shale stratum.[5] The Agreement provided for the "Closing" of the sale of the leasehold estates to take place on August 15, 2008, when the Family members, as applicable, would "execute and deliver" to Petrohawk counterpart oil and gas leases for each separate tract in a form to be agreed upon by the parties. It provided that Petrohawk would pay the Family $23,500.00 per net mineral acre lease bonus for each net mineral acre that the Family delivered free and clear of Title Defects. The term "title defects" was defined to mean any matter that would cause the title to the properties to fail to qualify as "defensible title," a term defined in the contract as

> title that: (i) is customarily accepted in oil and gas property purchase transactions; (ii) that [sic] is free and clear from liens and encumbrances that would reduce, impair or prevent Petrohawk from receiving payment from the purchasers of production, and (iii) the title to the properties comprising the Subject Interests includes all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale.[6]

---

[5]Walsh testified that Petrohawk's primary focus was acquiring rights in the Haynesville Shale and, secondarily, the Bossier Shale. The Haynesville Shale lies beneath the Bossier Shale. The Bossier Shale lies beneath the Cotton Valley formation and begins at its base. At times, the Bossier Shale has been considered part of the Cotton Valley formation. Petrohawk, as well as other companies, owned leases with producing oil and/or gas wells (producing leases) in the Cotton Valley and Bossier Shales. Since there are a number of formations that may contain oil and/or gas, many of the producing leases in Harrison County, including leases of some of the Family's mineral interests, contain vertical Pugh clauses that would release the mineral interests beneath the deepest producing formation or, in some instances, all interests more than 100 feet below the deepest perforation of the producing well. As a result, some of the Family's mineral interests in the upper Bossier Shale were held by producing wells in either the Cotton Valley or Bossier Shale.

[6]Hereafter, the mineral interests that meet the Agreement's specifications of unleased mineral interests east of Highway 59 in Harrison County without title defects (as defined in the Agreement) will be referred to as "qualifying

4

It also limited Petrohawk's obligation to lease to not more than 8,500 net mineral acres. In addition, the Agreement provided that Petrohawk would place $10,000,000.00 in escrow, which was to be applied to the purchase price at the closing. If the Family was unable to deliver oil and gas leases without title defects and having a net mineral acreage lease value that exceeded $10,000,000.00, or if Petrohawk and the Family did not agree to a lease form, then Petrohawk could terminate the Agreement without further liability, and the escrow would be returned to Petrohawk. On the other hand, if the Family delivered conforming leases with sufficient acreage and a lease value exceeding $10,000,000.00 and a lease form was agreed upon but Petrohawk refused to close the transaction, the escrow would be forfeited to the Family as liquidated damages.

Under the Agreement, the Family agreed to make their lease and title files, and any other information or documents they possessed, available to Petrohawk. Petrohawk agreed to keep the Family informed of the results of its title examination and give them the opportunity to cure any title defects in the tracts that were discovered in the search. Petrohawk agreed to notify the Family of any title defects not later than five days before closing. If the Family was unable to cure the title defects before closing, then it was given thirty days to cure any remaining title defects. At that time, the Family could execute additional leases covering those interests, and Petrohawk would pay the same $23,500.00 per acre lease bonus as with the other tracts.

At the time the Agreement was signed, Petrohawk did not know precisely the gross amount of the Family's mineral interests that were going to be available to be leased. However,

mineral interests."

it knew before the Agreement was signed that the Family had at least 4,800 mineral acres that may be available to lease. Petrohawk's Herod testified that his understanding was that Petrohawk would be leasing all of the net mineral acres that the Family owned east of Highway 59 in Harrison County that included the Haynesville Shale and that was unencumbered by a previous lease.

After the Agreement was signed, RWT began conducting due diligence regarding titles on behalf of Petrohawk, locating mineral interests owned by the Family covered by the Agreement, determining the interest owned by each member of the Family, reporting its results to Petrohawk, and preparing property descriptions (Exhibit A's) for each lease. As the title search work progressed, RWT's Chadwick kept the Family informed of the results of the title examination made by it on behalf of Petrohawk. Walsh testified that Petrohawk did not expect the Family to—nor was the Family obligated to—conduct its own title examination. If the Family had presented leases at the closing covering mineral interests that RWT and Petrohawk had not previously determined to have defensible title, Petrohawk would have rejected those leases. Herod testified that it is customary in the industry for companies like Petrohawk to verify mineral ownership and to prepare the leases for execution, which is what it did in this instance. He also testified that in accord with the Agreement, Petrohawk relied solely on its own title examination and due diligence (as conducted for it by RWT) to determine whether there was defensible title to the interests it was going to lease from the Family. The only leases of qualifying mineral interests that Petrohawk would accept were ones that RWT selected and Petrohawk approved.

As the August 15 closing date approached, it became apparent that RWT and Petrohawk would not have the title work finished on all of the properties. In view of this obstacle, Petrohawk requested an extension of the closing to August 27 to allow more time to complete title work (at least on some of the mineral interests), with a second "clean up" closing on September 17. The Family agreed to that extension. David Elkouri, Petrohawk's general counsel, sent an email on August 13 to other Petrohawk executives and RWT confirming this agreement. On or about August 27, leases covering thirty tracts and containing approximately 2,200 mineral acres were executed by the Family and Petrohawk, and Petrohawk paid the Family over $51,000,000.00, including some $31,000,000.00 going to Appellees. At the August 27 closing, Petrohawk and the Family agreed to release the $10,000,000.00 escrow deposit and include it in the amount paid by Petrohawk.

Before and after the August 27 closing, Petrohawk instructed RWT to continue its work identifying and verifying other mineral interests of the Family within the area set out in the Agreement in preparation for the September closing. Chadwick communicated the results of RWT's title search to Petrohawk and identified the interests proposed to be carried over to the September closing without any objection from Petrohawk. Members of the Family and Ned Hartline (one of the attorneys representing them in the transaction) testified that Petrohawk and Chadwick told them any properties not included in the closing of August 27 would be carried over to the September closing for closing at that time. As with the first closing, difficulty in verifying title caused the second closing to be postponed until October 9, with a third, final closing to be conducted on November 6. Herod stayed in contact with RWT to keep abreast of

7

the number of additional mineral acres to be closed on October 9 and on November 6 and to make sure that the Family agreed on the "acreage splits" among them. In late September, Petrohawk asked that the October 9 closing be moved up to October 8. As late as October 6, internal emails indicate that Petrohawk expected to close on the leases of the additional acreage. RWT prepared a list of properties for the October 8 closing showing those interests in which the Family had defensible title, totaling about 1,211 net mineral acres. RWT also prepared and forwarded to the Family Exhibit A property descriptions to be attached to the leases to be delivered at the October 8 closing. Then, on October 7, Petrohawk sent an email to the Family's attorney that stated, in part,

> Due to the unprecedented uncertainty in the capital markets, we are not in a position to close at this time. When we discussed the second closing we had no idea we would be faced with these extraordinary circumstances. We hope your clients understand and we would be happy to revisit this acreage when things get back nearer to normal. It has been a pleasure working with you and your clients and we look forward to an excellent relationship in the future.

The Family sought clarification from Petrohawk regarding when it would be able to close, but without success. By the end of October, Petrohawk took the position that the Agreement was closed on August 29 as to all acreage that had defensible title and that the Family had thirty days from that date to cure any title defects, which they did not do. Therefore, according to Petrohawk's communication, it believed that it had no further obligations to the Family under the Agreement. The undisputed testimony was that Petrohawk never notified the Family of any purported title defects.

The Family filed suit alleging Petrohawk had breached the Agreement and seeking either damages or specific performance. During the course of litigation, twelve family members settled

8

with Petrohawk, and Appellees proceeded to trial. At trial, the jury found, *inter alia*, that Petrohawk breached the Agreement and awarded damages and attorney fees to the Appellees. Appellees elected to accept the damages award, reserving their right to specific performance should the damages be overturned, and a judgment was entered on the jury verdict for damages totaling $12,389,089.05, attorney fees totaling $4,220,000.00, and post-judgment interest. Subsequently, Appellees volunteered to remit $912,767.98, which was then ordered by the court.

On appeal, Petrohawk asserts error based on (1) its allegation that the statute of frauds bars recovery under the changed agreement, (2) its claim of the legal insuffciency of evidence to support the jury findings, including its findings of liability and damages, (3) its position that the jury charge was in error, and (4) its claim that the award of attorney fees was in error. Since we find that (1) the statute of frauds does not bar enforcement of the parties' modification to the Agreement, (2) there is sufficient evidence to support the jury's liability and damages findings, and (3) there was no harmful error in the jury instructions, we affirm those portions of the trial court's judgment. Because we are unable to perform a factual sufficiency analysis concerning the attorney fees award, we reverse and remand the issue of attorney fees for a new trial.

## II.  Analysis

### A.  Statute of Frauds

#### 1.  Standard of Review

"Whether an agreement falls within the statute of frauds is a question of law." *Sterrett v. Jacobs*, 118 S.W.3d 877, 879 (Tex. App.—Texarkana 2003, pet. denied); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 594 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "A question of law

9

is subject to a de novo review." *Dixon v. Amoco Prod. Co.*, 150 S.W.3d 191, 194 (Tex. App.—Tyler 2004, pet. denied).

The statute of frauds applies to oil and gas leases and contracts to acquire the same. *Noxon v. Cockburn*, 147 S.W.2d 872 (Tex. Civ. App.—Galveston 1941, writ ref'd). When an agreement is subject to the statute of frauds, it is not enforceable unless the "agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him." TEX. BUS. & COM. CODE ANN. § 26.01(a) (West 2009). Further, the "statute of frauds requires that a memorandum of an agreement . . . must be complete within itself in every material detail and contain all of the essential elements of the agreement so that the contract can be ascertained from the writings without resorting to oral testimony." *Sterrett*, 118 S.W.3d at 879–80. Whether the writings are sufficient to satisfy the statute of frauds is a question of law. *See Bright & Co. v. Holbein Family Mineral Trust*, 995 S.W.2d 742 (Tex. App.—San Antonio 1999, pet. denied).

Generally, any modification to an agreement subject to the statute of frauds must also be in writing. *See Dracopoulas v. Rachal*, 411 S.W.2d 719, 721 (Tex. 1967). However, when there is an alleged modification to the original agreement, to satisfy the statute of frauds, the "modification . . . need not restate all the essential terms of the original agreement." *BACM 2001-1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 145–46 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Since a modification only alters those terms of the original agreement to which it refers, it leaves intact those unmentioned portions of the original agreement that are not inconsistent with the modification. *Id.* at 146; *see also*

10

*Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 547–48 (Tex. App.—Houston [1st Dist.] 1994, no writ).  Further, "'[o]ne writing may be connected with another either expressly or by necessary inference because of internal evidence of the subject matter and occasion, that is, that they relate to the same transaction.'"  *Preston Exploration Co.*, *L.P. v. GSF, L.L.C.*, 669 F.3d 518, 524 (5th Cir. 2012) (quoting *Oliver v. Corzelius*, 215 S.W.2d 231, 237 (Tex. Civ. App.—El Paso 1948), *rev'd on other grounds*, 220 S.W.2d 632 (Tex. 1949)).

There are exceptions to the rule that any modification must be in writing to be enforceable.  If the modification to the agreement is not a material one, then an oral modification may be enforceable.  Under certain circumstances, an oral agreement to extend the time of performance of a contract required to be in writing is enforceable, if the oral agreement is made before the written contract expires.  *Dracopoulas*, 411 S.W.2d at 722.  "Moreover, such an extension of time for performance may be implied as well as express . . . ."  *Triton Commercial Props., Ltd. v. Norwest Bank Tex., N.A.*, 1 S.W.3d 814, 818 (Tex. App.—Corpus Christi 1999, pet. denied).  However, an oral extension of time to perform is enforceable only if it does not materially alter the underlying written contract.  *Vendig v. Traylor*, 604 S.W.2d 424, 427 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.).  When the extension of time changes other contractual rights and duties, it materially affects the written contract and must itself be in writing.  *Id.*; *see Dracopoulas*, 411 S.W.2d at 722.  In other words, "where the terms of the extension differ so much as to make the modification an entirely new contract, the oral modification is unenforceable under the Statute of Frauds."  *Vendig*, 604 S.W.2d at 427.  But, when the extension of time to perform "has no such collateral effects on other rights under the underlying

11

written contract, the exception applies to allow oral modification." *Triton Commercial Props., Ltd.*, 1 S.W.3d at 818. In considering whether there was an oral agreement to extend the time for performance, the parties' behavior may be considered as evidence of the agreement. *Joiner v. Elrod*, 716 S.W.2d 606, 610 (Tex. App.—Corpus Christi 1986, no writ).

In order to determine whether a modification is material, we must determine the intent of the parties as expressed in the underlying contract. *See Dracopoulas*, 411 S.W.2d at 722 (oral extension of real estate listing contract for indefinite period materially affected other rights and duties); *Triton Commercial Props., Ltd.*, 1 S.W.3d at 818–19 (oral extension of time to execute option in real estate contract had no collateral effect on other contractual rights). In construing a written contract, our primary concern is to ascertain the intentions of the parties as expressed in the instrument. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *Craig Sessions*, *M.D., P.A. v. TH Healthcare, Ltd.*, 412 S.W.3d 738, 742 (Tex. App.—Texarkana 2013, no pet.). A contract term is given its plain and ordinary meaning unless the instrument indicates a different meaning is intended by the parties. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 742. The construction of an unambiguous contract is a question of law which we review de novo. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). When the contract is unambiguous, "the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968) (citations omitted). "A contract

12

is not ambiguous simply because the parties disagree over its meaning."[7] *Apache Corp.*, 294 S.W.3d at 168. Rather, only when "'its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation'" is a contract deemed ambiguous. *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 743 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). Further, when construing a contract, a court is "to take the wording of the instrument, consider the same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract." *City of Pinehurst*, 432 S.W.2d at 519.

### 2. The Extension/Second Closing Was Not a Material Alteration of the Agreement

In this case, Appellees argued below and secured jury findings to the effect that Appellees and Petrohawk had, before the original closing date, agreed to extend the closing to August 27, 2008, and then, prior to August 27, agreed to conduct two closings, the second to be held on September 17, 2008.[8] Petrohawk does not contest that the original closing was extended from August 15 to August 27. While denying the existence of any agreement to conduct two closings, Petrohawk argues that any such agreement was not enforceable because it was a material alteration of the Agreement and, therefore, is unenforceable under the statute of frauds. Petrohawk argues that the written Agreement contemplates only one closing, one at which Petrohawk would have the option of either accepting the leases executed and delivered by the Family or forfeiting its $10,000,000.00 escrow deposit as liquidated damages. Since the escrow

---

[7]Neither party in this case has contended that the Agreement is ambiguous.

[8]The Family also secured a jury finding that the second closing was extended until October 9, 2008.

13

deposit was applied to the purchase of the leases at the August 27 closing, this "walk away" option was not available in any subsequent closings. Petrohawk claims that a multiple closing modification would have deprived it of the right to know "all" that it was asked to lease before exercising this "walk away" option. This, according to Petrohawk, would have required it to accept whatever leases the Family presented "sight unseen" and subjected Petrohawk to "unlimited and indeterminate liability."

In support of its argument that the second closing modification was material, Petrohawk cites *Dracopoulas*, taking the position that it has "analogous facts." However, *Dracopoulas* involved the alleged oral modification of a real estate listing agreement in which the real estate agent claimed that there was an oral agreement to extend the agreement for an indefinite period of time. In examining the listing agreement, the Texas Supreme Court noted that an indefinite extension of the contract would render the termination date indefinite. This, in turn, would have substantially affected other rights and duties of the parties, including the duty to pay and the right to receive a commission on a sale if the sale was made to a prospective purchaser whom the agent had shown the property within ninety days after the termination date of the listing agreement. An indefinite extension of the agreement would have destroyed the agent's duty to identify those persons and erased the seller's protection from paying commissions on sales to certain persons made more than ninety days after the termination date. *Dracopoulas*, 411 S.W.2d at 722. In the case under consideration here, although there was no indefinite extension

of the Agreement contemplated,[9] we still must examine the Agreement to determine whether other rights and duties of the parties were materially affected.

In order to weigh Petrohawk's assertions, we must examine the intent of the parties as expressed in the Agreement and in light of the surrounding circumstances to determine what affect, if any, a second closing would have on Petrohawk's obligations. *See, e.g.*, *Dracopoulas*, 411 S.W.2d at 722; *Triton Commercial Props., Ltd.*, 1 S.W.3d at 818–19. As previously noted, the Agreement contains specific limitations regarding the quality of the titles to the properties Petrohawk would be obligated to lease. Under the Agreement, Petrohawk agreed to accept only those leases covering mineral interests that (1) were owned by the Family, (2) were located east of Highway 59 in Harrison County, (3) included interests in the Haynesville Shale and, if unleased, the Bossier Shale, (4) possessed defensible title, and (5) in total, did not exceed a maximum of 8,500 net mineral acres. Further, the Agreement indicates that Petrohawk would be performing title examinations on the Family's mineral interests, providing the Family the results of the title examination, and notifying the Family, at least five days before closing, of any title defects which Petrohawk alleged existed on the property. At trial, Herod acknowledged that it is the custom in the industry for the oil and gas company to verify mineral ownership, identify title defects, and prepare the leases for execution, and that Petrohawk did so in this case.

---

[9]Petrohawk asserts as proof that the modification was for an indefinite extension that the Family expected it to accept, sight unseen, the Family's demand and tender, after suit had been filed, of leases covering thirty-four tracts, fourteen of which Petrohawk claimed no one knew existed as of October 2008, citing the testimony of the Family's trial attorney, Harwell. However, an examination of Harwell's testimony shows he clearly denied this contention. The post-suit tender appears to be an attempt by the Family to show they were willing and able to perform, even at that late date. Appellees did not contend at trial that the time for the second closing extended indefinitely. Further, if the Family had tendered leases for tracts that would not be qualifying mineral acres under the Agreement, Petrohawk would clearly have had no obligation to accept them.

Petrohawk's Walsh testified that Petrohawk would not accept leases tendered by the Family covering mineral interests that RWT (as the representative of Petrohawk) had not determined had defensible title. Appellees neither made a claim at trial, nor do they claim on appeal, that the second closing operated to change these obligations in any way. By performing its due diligence, as contemplated by the Agreement, Petrohawk was in the position to determine what mineral interests of the Family it was obligated to lease (irrespective of whether this was achieved at one closing or at multiple closings). All parties testified at trial that delays in performing this due diligence was the reason for the original extension from the original closing date of August 15 to August 27. Testimony of the Family and RWT's Chadwick, as well as emails originating from Petrohawk officers, also attribute these delays in title examinations as the reason for the proposed second, and possibly third, closing. Thus, under the Agreement, Petrohawk's lease obligations were neither unlimited, nor indeterminate, nor unseen.[10]

Regarding the $10,000,000.00 escrow deposit, the Agreement provides,

Such Escrow Deposit shall be applied against the price specified in paragraph 3 at the Closing. In the event: (i) Lessors are unable to deliver without Title Defects oil and gas leases covering the Interests that have a net mineral acreage lease value that exceeds $10,000,000.00; or (ii) Petrohawk and Lessors do not agree upon the lease form for the leases to be executed pursuant to this Agreement by the Lease Approval Date; Petrohawk may, at its option, terminate this Agreement at any time on or before the Closing, without liability, and the Escrow Deposit shall be returned to Petrohawk and neither party shall have any further obligation to each other arising out of this Agreement. In the event that Lessors are able to comply with and satisfy all of the conditions set forth in the preceding sentence and Petrohawk refuses to close this transaction, the Escrow Deposit shall be

---

[10]Of the twenty-eight tracts which the jury found that Petrohawk had refused to lease, twenty are listed on Exhibit A to the Agreement, another six are possibly listed (with discrepancies as to number of acres), and two are not listed. Of the eight possibly listed or not listed on Exhibit A, six are included on the list of tracts prepared for the second closing.

16

forfeited to Lessors as liquidated damages, which liquidated damages shall be the sole and exclusive remedy of Lessors against Petrohawk.

Petrohawk asks us to concentrate solely on the last half of the last sentence to find that a second closing would necessarily deprive it of its "walk-away option" and, thus, its limitation of damages. However, we must examine the entire Agreement and give effect to each provision so that none is rendered meaningless. *See Craig Sessions, M.D., P.A.*, 412 S.W.3d at 745. When examining the Agreement, all of its provisions will be considered in light of the Agreement as a whole and no single provision will be given controlling effect. *See id.*

The Agreement expresses the parties' intent to lease all of the Family's mineral interests east of Highway 59 in Harrison County, subject to the restrictions previously noted. Petrohawk's Herod testified that this was his understanding from the beginning. It is undisputed that at the time the Agreement was signed, neither Petrohawk nor the Family knew exactly how many mineral acres the Family owned. Because of the substantial amount of lease bonus being invested and the intense competition from other companies to lease the Family's interests, the Agreement reflects several clauses designed to protect both Petrohawk and the Family. In addition to specific restrictions on what kind of mineral acres would qualify, the Agreement limited the maximum amount Petrohawk was required to lease to 8,500 net mineral acres. On the other end, if the Family did not own sufficient unleased net mineral acres to have a lease value exceeding $10,000,000.00, Petrohawk could walk away without liability, and the escrow deposit would be returned to it. Further, paragraph 7 of the Agreement protected Petrohawk by prohibiting the Family from "seek[ing], solicit[ing], encourage[ing] or entertain[ing] any proposals or offers from any third party with respect to the leasing" of the mineral interests that

17

were subject to the Agreement until the earlier of (i) the closing or (ii) abandonment of the transaction.

By contrast, there are only two clauses that protected the Family and ensured it that Petrohawk would either honor its agreement to lease all of the Family's qualifying mineral interests or forfeit its $10,000,000.00 escrow deposit. The first clause gave the parties a specific date to approve a lease form, after which the Family, at its option, could terminate the Agreement. It is undisputed that Petrohawk and the Family approved a lease form and the Family did not exercise this option. The form of the lease was not a subject of controversy here.

The other clause is located in paragraph 6, which also contains Petrohawk's walk-away option and resulting limitation of damages. This clause contains a condition precedent that, if met, requires Petrohawk to choose whether to go through with the Agreement or forfeit the escrow. The clause states that if the Family is "able to comply with and satisfy all of the conditions set forth in the preceding sentence and Petrohawk refuses to close this transaction, the Escrow Deposit shall be forfeited to Lessors as liquidated damages . . . ." Thus, this clause not only protected Petrohawk by limiting its damages if it decided to walk away, it compensated the Family for removing their mineral interests from the market at a time when bonus prices were skyrocketing.[11] Had Petrohawk simply decided to lease none of the Family's property, the $10,000,000.00 would have been paid to the Family for having given Petrohawk the exclusive option during the term of the Agreement to purchase the leases. Although the conditions in the preceding sentence are stated in the negative, they require the Family to deliver "without Title

_____
[11]Petrohawk's land manager, Walsh, testified that in 2008, lease bonuses for the Haynesville Shale ran up from $150.00 to a high of $30,000.00 per mineral acre and that this clause was "a safety net for both sides."

18

Defects oil and gas leases covering the Interests that have a net mineral acreage lease value that exceeds $10,000,000.00" and for Petrohawk and the Family to agree upon the lease form. It is undisputed that as of August 27, both of these conditions were satisfied by the Family. The evidence at trial also showed that both Petrohawk and the Family knew before August 27 that the conditions would be fulfilled at the August 27 closing, but that there remained a significant number of unleased mineral acres owned by the Family on which Petrohawk was still performing its due diligence and which would be held over to a second closing.[12] Under these facts, an oral agreement to hold a second closing on the additional qualifying mineral interests made before the August 27 closing would have no effect on Petrohawk's rights under this clause since it could still refuse to close at the August 27 closing and forfeit the $10,000,000.00 as liquidated damages or, alternatively, as the cost for obtaining the exclusive option to lease during the term of the Agreement. Rather than do this, Petrohawk chose to fulfill its obligations under the Agreement by accepting the leases tendered at the August 27 closing and applying the $10,000,000.00 to the purchase price, as provided in the Agreement. Thus, it was not the modification that caused the liquidated damages clause to become a nullity after the first closing, but rather, Petrohawk's partial performance of its obligations under the Agreement.

In its reply brief and at oral argument, Petrohawk asserted that two cases originally cited in Appellees' brief supported their contention that the modification agreement caused the liquidated damages provision to become a nullity and, thus, amounted to a material modification

---

[12]RWT landman Chadwick testified that before August 27, he had identified and notified Petrohawk officers of at least twelve additional tracts totaling over 800 acres that were to be carried over to the second closing.

of the written contract. *See Logue v. Seven-Hot Springs Corp.*, 926 F.2d 722 (8th Cir. 1991); *Mott v. Graves*, No. 02A01-9410-CH-00244, 1995 WL 755926 (Tenn. Ct. App. Dec. 20, 1995) (not designated for publication).[13] *Logue* involved an original agreement to purchase a forty-acre tract. The purchase agreement contained a standard escrow deposit provision providing that the escrow deposit ($5,000.00) would be liquidated damages paid to the seller if the buyer did not perform and that it would be applied to the purchase price if he did perform. A later amendment to the contract split the tract into three parcels and provided for three separate closing dates. *Logue*, 926 F.2d at 723. The parties closed on the first parcel and applied the escrow deposit to the purchase price. After closing on the second parcel, the buyer notified the seller it would not close on the third parcel and tendered a check for $5,000.00 as "liquidated damages." *Id.* at 723–24. In holding that the purchaser was obligated for the full contract amount, the Eighth Circuit Court of Appeals noted that once the escrow deposit was applied to the purchase price of the first parcel, there was nothing left to be used as liquidated damages in the future. The court pointed out that the division of the property, "*coupled with buyer's partial performance* in purchasing two of those parcels, nullified the liquidated damages clause of the original agreement." *Id.* at 724 (emphasis added). The Tennessee Court of Appeals in *Mott* also held that up until buyer's partial performance, the liquidated damages provision was still available. As in this case, it was the partial performance of the buyer in *Mott* that nullified the provision, not the modification of the contract. *See Mott*, 1995 WL 755926, at *3.

---

[13]Neither of these cases provides precedent this Court must follow.

20

Petrohawk also argues that when a plaintiff asserts that the defendant's prior breach of an oral modification of an agreement subject to the statute of frauds excuses the plaintiff's performance under the agreement, then the modification is material and must be in writing, citing *SP Terrace, L.P. v. Meritage Homes of Texas*, *LLC*, 334 S.W.3d 275, 283 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Walker v. Tafralian*, 107 S.W.3d 665, 670 (Tex. App.—Fort Worth 2003, pet. denied); and *King v. Texacally Joint Venture*, 690 S.W.2d 618, 620 (Tex. App.— Austin 1985, writ ref'd n.r.e.). In examining these cases, we note that this proposition was first set forth in *King* by the Austin Court of Appeals, with no analysis or citation to any supporting authority. *King*, 690 S.W.2d at 620. In that case, the proposition appears to be dictum and a rebuke of the party refusing to honor its obligation, who was attempting to offensively use the doctrine of excuse for nonperformance against an innocent party. *Id.* The Fort Worth court then employs the proposition as if it were a rule of law, citing *King*, as does the Houston court, citing both *Walker* and *King*. Neither of these later cases provides any analysis of how the subject modifications would have changed the obligations and rights of the parties or substantially altered the original agreements. *SP Terrace, L.P.*, 334 S.W.3d at 283; *Walker*, 107 S.W.3d at 670. The materiality of an oral modification does not depend on the parties' reliance on the modification, but rather on whether it changes the obligations and rights of the parties or substantially alters the original agreement. *Dracopoulas*, 411 S.W.2d at 722; *Triton Commercial Props., Ltd.*, 1 S.W.3d at 818; *Vendig*, 604 S.W.2d at 427. Therefore, we decline to follow our sister courts of appeal on this issue.

21

We find that the oral modification to conduct multiple closings neither changed the obligations and rights of the parties under the Agreement nor substantially altered the Agreement itself. Therefore, the modification was not material, the modification was not required to be in writing, and enforcement of the modification is not barred by the statute of frauds. We overrule this point of error.[14]

### B.    Evidentiary Sufficiency

### 1.    Standard of Review

In determining legal sufficiency, the appellate court determines "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 582 (Tex. App.—Texarkana 2012, no pet.). In looking at the evidence, we credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *City of Keller*, 168 S.W.3d at 827. The evidence is legally insufficient if (1) there is a complete absence of evidence of a vital fact; (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence offered to prove a vital fact; or (4) the opposite of the vital fact is conclusively established by the evidence. *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010). More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Less than a scintilla of evidence exists when the evidence is 'so

---

[14]Since we find that the modification was not required to be in writing, we do not address Petrohawk's argument that there was not a sufficient writing to satisfy the statute of frauds.

22

weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

### 2. There is Sufficient Evidence to Support the Jury's Answer to Question 2.

Petrohawk asserts that there was legally insufficient evidence to support the jury's finding in favor of Appellees in regard to Question 2. Question 2 asks, "Prior to August 27, 2008[,] did Petrohawk and Plaintiffs agree to conduct two closings, the second closing to be on September 17, 2008, for all of Plaintiffs' Properties not leased at the August 27, 2008[,] closing?" It also contains a definition of the term "Plaintiffs' Properties" as "Plaintiffs' unleased mineral interests east of Highway 59 in Harrison County, Texas, including but not limited to those certain properties listed on Exhibit 'A' attached to the July 11, 2008[,] contract, provided that they include rights in the Haynesville Shale."

Petrohawk correctly asserts that in considering the sufficiency of the evidence to support the jury's answers, we are limited by what the charge actually says. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Question 2 asks prior to August 27, 2008, (1) did the Plaintiffs and Petrohawk agree to conduct two closings, the second closing to be on September 17, 2009, (2) for all of Plaintiffs' Properties not leased at the August 27, 2008, closing. This question essentially inquires whether there has been an agreement between the parties to modify the Agreement. A modification only alters those terms of the original agreement to which it refers and leaves intact those other provisions of the original agreement that are not inconsistent with it. *Trafalgar Holdings I, Ltd.*, 218 S.W.3d at 146. Terms not addressed in the modification may be

23

supplied by the original agreement. *Id.* Further, in considering whether there has been an oral modification of the Agreement, the parties' behavior may be considered as evidence of the agreement. *See Joiner*, 716 S.W.2d at 610.

In Question 2, the trial court looked to the Agreement to supply the definition of the term "Plaintiffs' Properties." The Agreement also provides the obligation of Petrohawk to lease all of the Family's qualifying mineral interests, and, by implication, that Petrohawk would lease the remainder of Plaintiffs' Properties. The parties all testified that the determination of qualifying mineral interests was an ongoing process, and the reason that only part of the Family's qualifying mineral interests were closed on August 27 was that Petrohawk was still performing its due diligence title research. As discussed above, before August 27, Petrohawk's landman had already identified at least 800 additional mineral acres that would be held over to the second closing and continued to identify and verify title to and keep Petrohawk informed of additional acreage as the second closing approached. In addition, as also noted above, Petrohawk's Herod testified that his understanding was that Petrohawk would lease all of the Family's qualifying mineral interests. Thus, there is sufficient evidence to support the second part of Question 2.

There is also evidence that both Petrohawk and Appellees agreed to a second closing on September 17. First, there is an August 13, 2008, email from Petrohawk's vice president and general counsel, David Elkouri, to other Petrohawk officers. This email states that Elkouri has talked with the Family's attorney and that "[w]e have an agreement on all major points . . . . This deal is going to close on the 27th on everything that we can verify title on. We will have a second (clean up closing) on September 17th." The email contains the typed signature block of

24

"David S. Elkouri, Executive Vice President, General Counsel & Secretary, Petrohawk Energy Corporation." There is no dispute that he sent the email. The email reflects an agreement to have two closings, one August 27 and a second September 17. Ned Hartline, one of the Family's attorneys, confirmed that this email accurately reflected the parties' agreement. In addition, each of the Appellees who testified affirmed either that they agreed to the two closings or that Kim Schrivener and Hartline had authority to agree on their behalf. Schrivener also testified that Hartline had authority to agree to the extension and two closings and that the agreement to have two closings as stated in Elkouri's email was consistent with his authority.

Hartline confirmed that the statement regarding two closings was consistent with the conduct of all the parties after August 13. Chadwick, Petrohawk's contract landman, testified that the instructions he received from Petrohawk and his communications with Petrohawk were consistent with an agreement to hold two closings, the second to be on September 17. He testified that Petrohawk instructed him to continue his work identifying and verifying other mineral interests owned by the Family within the area set out in the Agreement in preparation for the September closing. He communicated his results to Petrohawk, and his proposed interests were to be carried over to the September closing without any objection from Petrohawk. His spreadsheet of properties to be closed on August 27 also includes properties that he had identified to be held over to the second closing, those containing over 800 net mineral acres.

Thus, there was sufficient evidence for a reasonable and fair-minded jury to answer Question 2 in the affirmative. Although there was some testimony to the contrary, it was not conclusively established. The credibility of the witnesses and the weight to be given their

25

testimony is the sole province of the jury, and an appellate court cannot impose its opinions to the contrary. *City of Keller*, 168 S.W.3d at 819. We overrule this point of error.

**3.      There is Sufficient Evidence to Support the Jury's Answer to Question 9**

Petrohawk also asserts that there was legally insufficient evidence to support the jury's answer to Question 9.[15] Its insufficiency claim is premised on its claim that two instructions under Question 9 were erroneous. Although Petrohawk made timely objections to the instructions at trial, it offered no alternative instructions. Since it objected at trial, if the instructions are erroneous, then whether there is legally sufficient evidence to support the jury's answer finding that Petrohawk failed to perform the July 11, 2008, contract must be judged not by the charge that was given, but by the charge that should have been given. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

---

[15]Question 9 reads as follows:

> Did Petrohawk fail to perform the July 11, 2008[,] contract by not leasing Plaintiffs' unleased Haynesville shale mineral acreage in the following tracts? Please answer "Yes" or "No" as to each tract listed below.

> In answering this question, you shall consider the closing date of the July 11, 2008[,] contract to be extended or waived, if and only if and to the extent that you have so found in your answer to Questions 1, 2, 3, 4 or 5.

> You are instructed that the sentence in paragraph 2 of the July 11, 2008[,] contract reading: "At the Closing, the applicable Lessors will execute and deliver to Petrohawk, Oil and Gas Leases leasing each separate tract" does not alter or limit the contract's requirement in paragraph 3 reading: "The Leases will include and the Lease Bonus will be paid on all of Lessors' mineral interests under those properties in the Subject Area with Defensible Title."

> You are also instructed that the July 11, 2008[,] contract's language in paragraph 3(iii) reading: "the title to the properties comprising the Subject Interests includes all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale" does not require the Lessors to own 100% of the gross Haynesville Shale mineral acreage on the tract.

(There then follows a chart listing thirty-two individual tracts identified by survey name, acreage, and RWT ID No., to which the jury could answer "Yes" or "No" for each tract.)

### a. Standard of Review

A trial court is required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). Determining what jury instructions are necessary and proper is a matter within the trial court's discretion, and our review is to determine if there has been an abuse of that discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. TEX. R. APP. P. 61.1. Generally, if a charge error relates to a contested, critical issue, it is considered harmful. *Hawley*, 284 S.W.3d at 856. The error is harmless, however, "'when the findings of the jury in answer to other issues are sufficient to support the judgment.'" *Shupe*, 192 S.W.3d at 579 (quoting *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980)); *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) ("[A] jury question may be immaterial, and therefore its submission harmless, 'when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict.'").

The proper construction of the Agreement was contested in several pretrial motions. If the trial court resolves a dispute over the construction of a provision of a contract according to the rules of construction, it should include that interpretation when submitting the question on

failure to comply or perform the contract. *See* STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT PJC 101.7 (2012). Although we do not have the trial court's specific rulings regarding its interpretation of the contract in the appellate record, we assume that the instructions accompanying Question 9 are reflective of its interpretation.

### b. Any Error in the Trial Court's Instruction Regarding the Delivery of Leases was Harmless

At trial, Petrohawk objected to the following instruction given under Question 9:

> You are instructed that the sentence in paragraph 2 of the July 11, 2008[,] contract reading: "At the Closing, the applicable Lessors will execute and deliver to Petrohawk, Oil and Gas Leases leasing each separate tract" does not alter or limit the contract's requirement in paragraph 3 reading: "The leases will include and the Lease Bonus will be paid on all of Lessors' mineral interests under those properties in the Subject Area with defensible title."

On appeal, Petrohawk contends that this (1) operated effectively as a directed verdict in Appellees' favor that they were not required to deliver leases at closing and that Petrohawk could be held liable for leasing mineral interests that Petrohawk never knew about or for which Appellees never delivered a lease and (2) improperly allowed the jury to find breach as well as an excuse for Appellees' failure to deliver leases.

We must first determine whether the trial court's instruction correctly construes these provisions of the Agreement. Our primary concern is to ascertain the intentions of the parties as expressed in the instrument. *Valence Operating Co.*, 164 S.W.3d at 662 ; *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 742. Contract terms are given "their plain and ordinary meaning unless the instrument indicates a different meaning" is intended by the parties. *Dynegy Midstream Servs.,*

28

*Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)); *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 742. "Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement." *City of Pinehurst*, 432 S.W.2d at 518. Further, when construing a contract, the appellate court is "to take the wording of the instrument, consider the same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract." *Id.* at 519. In addition, although evidence of custom and trade usage may not be used to contradict an express term, it is "admissible to explain, supplement, or qualify a term or an agreement." *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 745–46; *see also Lynx Exploration & Prod. Co. v. 4-Sight Operating Co.*, 891 S.W.2d 785, 789 (Tex. App.—Texarkana 1995, writ denied) ("A valid usage or custom concerning the subject matter of a contract may be imputed to the parties and incorporated into the contract by implication.").

In the Agreement, paragraph 2 provides that "[a]t the Closing, the applicable Lessors will execute and deliver to Petrohawk, Oil and Gas Leases leasing each separate tract." Paragraph 3 provides that these leases shall provide for a lease bonus of $23,500.00 for each net mineral acre "that is delivered by Lessors to Lessee without Title Defects." The same paragraph defines title defects as "any matter that would cause the title to the properties to fail to qualify as 'Defensible Title.'" It then goes on to provide that the "Leases will include and the Lease Bonus will be paid on all of Lessors' mineral interests under those properties . . . with Defensible Title." Petrohawk concentrates its construction of the Agreement on these three clauses to conclude that its

obligation to pay the lease bonus was only triggered when the Family delivered leases without title defects. However, that is not the end of our inquiry since there is another clause that impacts the duties of the parties under the Agreement.

Paragraph 4 provides,

Petrohawk will keep Lessors informed as to the results of its title examination and provide copies of same to the extent requested by Lessors and afford Lessors the opportunity to cure Title Defects that may be discovered and disclosed. *Petrohawk shall notify Lessor of any Title Defects* not later than five (5) days *before* closing and if the Title Defects cannot be cured before closing, then Lessor shall have thirty (30) days after closing to cure any remaining Title Defects.

(Emphasis added).

Petrohawk contends that paragraph 4 of the Agreement merely gave Petrohawk the right (not the obligation) to perform title examinations. However, this clause requires Petrohawk to keep Lessors informed of its results and notify Lessors of any title defect at least five days before closing. Petrohawk's construction would render this clause meaningless, since it is only by performing title examinations that Petrohawk hoped to fulfill these obligations. Further, Petrohawk's interpretation is contradicted by the testimony of its officers. Herod testified that it is customary in the industry for companies like Petrohawk to verify mineral ownership and to prepare the leases for execution, which is what it did in this instance. He also testified that in accord with the Agreement, Petrohawk relied solely on its own title examination and due diligence to determine whether there was defensible title to the interests it was going to lease from the Family. Walsh testified that the only leases of qualifying mineral interests that

30

Petrohawk would accept were ones that RWT had selected and Petrohawk had approved.[16] Herod's testimony regarding the custom and usage in the industry is helpful to explain or supplement the meaning of paragraph 4 and what the parties intended by it. Further, this evidence is especially appropriate in this instance since the Agreement's definition of defensible title includes "title that: (i) is customarily accepted in oil and gas property purchase transactions . . . ."

Since we assume the parties intended "every clause to have some effect and in some measure to evidence their agreement," *see City of Pinehurst*, 432 S.W.2d at 518, we reject the construction urged by Petrohawk. Rather, in considering the Agreement in its entirety and the surrounding circumstances, we find that a proper construction is that the parties intended that Petrohawk would perform the title examinations, verify those mineral interests that were without title defects, and keep the Family informed of its results so they could have the opportunity to cure any title defects Petrohawk identified. At the very least, it contained an implied promise by Petrohawk to perform the title examination and advise the Family of the mineral interests that would be acceptable. "[I]f one party makes an express promise that cannot reasonably be performed absent some type of performance by the other party, courts may imply a return promise so the dealings of the parties can be construed to mean something rather than nothing at all." *Mann Frankfort Stein & Lipp Advisors, Inc. v Fielding*, 289 S.W.3d 844, 850 (Tex. 2009).

In construing the duties of Petrohawk under paragraph 4 with the other provisions, it becomes apparent that since only leases for minerals that were without title defects would be

---

[16]At oral argument, Petrohawk's counsel candidly acknowledged its duty to examine and verify title before leases could be prepared, executed, and delivered.

31

acceptable, before the Family could execute and deliver leases without title defects, Petrohawk must first perform a title examination and inform them of the mineral interests that would be acceptable. Until Petrohawk performed its title examination and advised the Family of the qualifying mineral interests, the Family could not "execute and deliver" qualifying leases. "[W]hen it is clear that performance expressly promised by one party is such that it cannot be accomplished until a second party has first performed, the law will deem the second party to have impliedly promised to perform the necessary action." *Id.* at 851. If Petrohawk failed to perform its title examination or, having done it, failed to inform the Family of the qualifying mineral interests, then the Family members would be unable to "execute and deliver" leases covering minerals without title defects. It follows that Petrohawk cannot fail to perform these duties, then hide behind the Family's consequent failure to execute and deliver leases to avoid its duty to pay the lease bonus on all the Family's qualifying mineral interests.

The question then becomes whether the trial court's instruction was erroneous under the proper construction of the Agreement and, if it was erroneous, whether it was harmful. In its instruction, the trial court appears to have attempted to convey the proper construction. However, the instruction was incomplete. The jury should have been instructed that the Agreement required Petrohawk to perform its title examination to determine the existence of defensible title before Appellees had a duty to execute and deliver leases and that if Petrohawk failed or refused to perform the title examination, or, having performed the title examination, refused to lease qualifying mineral acres, then Appellees' failure to execute and deliver leases

would not relieve Petrohawk of its obligation to pay the lease bonus on the qualifying mineral interests. Thus, the instruction was erroneous.

The error was, however, harmless, since the jury's findings on other issues sufficiently support the judgment. *Shupe*, 192 S.W.3d at 579. The jury answered three questions in favor of Appellees that when taken together, demonstrate that the instruction was harmless. First, the jury found in answer to Question 6 that each Appellee was at all times ready, willing and able to perform the Agreement. In addition, Question 7 asked the jury whether Petrohawk's failure to perform title examinations excused Appellees' failure to execute and deliver additional leases, a question which was answered in the affirmative. Finally, Question 8 asked if Appellees' failure to execute and deliver additional leases was excused because Petrohawk repudiated its obligations under the Agreement, which was also answered in the affirmative. Both Questions 7 and 8 contained the following instruction:

> In this regard, you are instructed that when performance expressly promised by Plaintiffs is such that it cannot be accomplished until Petrohawk has first performed, the law will deem Petrohawk to have impliedly promised to perform the necessary action.

Petrohawk does not challenge the sufficiency of the evidence to support the jury's answers to Questions 6, 7, or 8. The same evidence that supports the jury's answers to Questions 6, 7, and 8 would support an affirmative answer to Question 9 if it had included the instruction that should have been given. *See St. Joseph Hosp.*, 94 S.W.3d at 530. Therefore, we find that any error in this instruction was harmless and that there is sufficient evidence that supports the jury's answer to Question 9 with the instruction that should have been given. We overrule this point of error.

33

### c. There is no Error in the Instruction Regarding the Percentage of the Haynesville Shale Ownership Rights

Petrohawk also objected to the following instruction given under Question 9:

> You are also instructed that the July 11, 2008[,] contract's language in paragraph 3 (iii) reading: "the title to the properties comprising the Subject Interests includes all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale" does not require the Lessors to own 100% of the gross Haynesville Shale mineral acreage on a tract.

Once again, we must determine whether the instruction properly construes the Agreement. Petrohawk concentrates on this single clause in the Agreement and contrasts "all rights" with "rights owned by Lessors" to conclude that the parties must have intended that "all rights" means that the Family was required to own 100 percent of the fee mineral estate in the Haynesville Shale, whereas it could own only a partial mineral estate in the Bossier Shale. However, this construction conflicts with other provisions in the Agreement that indicate the parties intended Petrohawk to lease all of the Family's mineral interests and would render these provisions meaningless.[17] Rather, we examine the Agreement in its entirety since we presume the parties "intend every clause to have some effect and in some measure to evidence their agreement." *City of Pinehurst*, 432 S.W.2d at 518. Further, we realize that the Agreement was not created in a vacuum, so we consider the wording of the Agreement in the light of the surrounding circumstances, then apply the relevant rules of construction to determine its meaning. *See id.* at 519.

---

[17]It also contradicts the testimony of Petrohawk's Herod, who testified that the Agreement provided that Petrohawk would lease all of the unleased net mineral acres that the Family owned east of Highway 59 in Harrison County that included the Haynesville Shale.

First, we look to the Agreement itself.  There are two clauses pertinent to this analysis.

The first, unnumbered paragraph provides,

> This agreement to lease shall include *all unleased mineral interests* east of Highway 59 in Harrison County, Texas, including but not limited to those certain properties listed on the attached Exhibit "A" included within the Subject Area ("Subject Interests"), *provided that such Subject Interests include rights in the Haynesville Shale*.  Lessors and [Petrohawk] desire to enter into oil and gas leases covering the Subject Interests.  The parties agree that the Subject Interests shall include *any and all unleased mineral interests owned by Lessors located 100' below the base of the formation containing the deepest producing perforated interval in any currently producing oil and/or gas well* located on the properties comprising the Subject Interests, or any lands unitized therewith, but at a minimum *must include the Haynesville Shale and*, *if unleased*, *the Bossier Shale rights* thereunder.  It is specifically agreed to and understood that *the oil and gas leases* covering the Subject Interests to be executed as contemplated herein *shall include all depths*, *subject to the lease provisions contemplated in paragraph 3 herein*, as to those properties within the Subject Interests that are currently unleased or *not currently producing*.

(Emphasis added).  Paragraph 3 provides,

> The Leases shall cover the unleased mineral interests of Lessors in the Subject Area at a price of $23,500.00 per net mineral acre ("Lease Bonus") for each net mineral acre of the Subject Interests that is delivered by Lessors to Lessee without Title Defects . . . a title defect ("Title Defects") shall mean any matters that would cause the title to the properties to fail to qualify as "Defensible Title".  [sic] Defensible Title shall mean a title that:  . . . (iii) *the title to the properties comprising the Subject Interests includes all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale.*  The Leases will include and the Lease Bonus will be paid on all of Lessors' mineral interests under those properties in the Subject Area with Defensible Title.

(Emphasis added).

In order to determine the parties' intention, we must construe these two paragraphs together such that all of the provisions are given effect and none is rendered meaningless.  *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 745.  Further, when we consider the circumstances prior to

35

and contemporaneously with the making of the Agreement, the meaning becomes clear, as does the reason for the use of the differing phrases in paragraph 3(iii). It is undisputed that Petrohawk and the Family were familiar with the oil and gas production in east Harrison County in 2008, the effect that pre-existing oil or gas production may have on the availability of mineral rights to be leased in certain strata, and the location of the relevant geological formations. There were three geological formations or strata that were of concern: the Cotton Valley, the Bossier Shale, and the Haynesville Shale. The Haynesville Shale is the deepest of these formations and is situated beneath the Bossier Shale. The Bossier Shale lies at the base of the Cotton Valley and is sometimes considered part of the Cotton Valley. Petrohawk had producing wells in the Cotton Valley formation. Also, some of the Family's mineral interests were held by oil or gas production, at least as to the shallower depths, such as the Cotton Valley. Since there are a number of formations that may contain oil and/or gas, many of the producing leases in Harrison County (including leases of some of the Family's mineral interests) contained vertical "Pugh" clauses that would release the mineral interests beneath the deepest producing formation or, in some instances, all interests more than 100 feet below the deepest perforation of the producing well. As a result, for some tracts, the Family's mineral interests in the upper Bossier Shale were held by producing wells in either the Cotton Valley or Bossier Shale formations, while their mineral interests in the lower Bossier Shale under those same tracts would not be held by production under existing leases. While Petrohawk was primarily focused on leasing Haynesville Shale mineral interests, it was secondarily interested in the Bossier Shale.

36

Looking back at the Agreement with this in mind, we see in the first paragraph that the parties intended that Petrohawk would lease all of the Family's unleased mineral interests in the subject area as long as those interests included, at a minimum, the Haynesville Shale (its primary focus), and those depths of the Bossier Shale that were unleased and not held by production (its secondary focus). They recognized that some of the tracts would be held by producing wells that contained vertical Pugh clauses so that not all depths of the Bossier Shale would be available to lease. But they intended that whatever depths of the Bossier Shale were unleased and not held by production would be included in the Agreement and would be leased by Petrohawk. At the same time, the Agreement makes clear that the leases must include all the Family's mineral interests to all depths of the Haynesville Shale. The last sentence of the first paragraph emphasizes that the oil and gas leases "shall include *all depths*, subject to the lease provisions contemplated in paragraph 3 herein . . . that are currently unleased or not currently producing." Paragraph 3 (iii) then requires the leases to include "all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale." In other words, the leases must include the rights to *all depths* in the Haynesville Shale and the rights to *all depths currently unleased or currently not producing* owned by the Lessors in the Bossier Shale. This interpretation gives effect to all of the pertinent provisions of the Agreement and none is rendered meaningless.[18] *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 745.

---

[18]Although not relevant to our analysis because it reflects on the conduct of the parties, we note that if the construction Petrohawk now advocates were in fact the initial understanding of the parties, then it would be expected that Petrohawk would notify the Family of all title defects (which, according to Petrohawk, would include tracts in which the Family owned less than 100 percent of the mineral acreage in the Haynesville Shale). The evidence shows that Petrohawk never did this. To the contrary, out of the thirty tracts Petrohawk leased at the August 27 closing, ten were tracts in which the Family owned less than 100 percent of the mineral acreage.

Since the Agreement required Petrohawk to lease all of the Family's mineral interests that included the Haynesville Shale and did not require the Family to own 100 percent of the gross Haynesville Shale mineral acreage on any tract, we find no error in the trial court's instruction. Since Petrohawk's legal insufficiency complaint was premised on this instruction being erroneous, it has become moot. We overrule this point of error.

**4.    There is Sufficient Evidence to Support the Jury's Answers to Questions 3 and 5**

Petrohawk also asserts that there is insufficient evidence to support the jury's affirmative answers to Questions 3 and 5. Petrohawk does not state whether its sufficiency challenge is to the legal sufficiency or the factual sufficiency to support the jury's answers. Therefore, we will treat it as a challenge to both. We have previously set forth the standard of review for a legal insufficiency challenge. When reviewing a jury verdict for factual sufficiency of the evidence, we consider and weigh all the evidence and only set aside the verdict "if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We find that there is sufficient evidence under both standards to support the jury's answers.

Question 3 asked whether the parties had agreed to extend the September 17, 2008, closing date to October 9, 2008. Question 5 asked whether Petrohawk had waived Appellees' compliance with the September 17, 2008, closing date.[19] As noted in *SP Terrace, L.P.*,

> Waiver may result when: (1) a party assents to the other party's continued performance without objection to the delay; (2) a party states that it will not require strict compliance with a deadline or acts such that the other party reasonably believes strict compliance will not be required; or (3) a party insists on performance by the other party even after breach of the agreement.

*SP Terrace, L.P.*, 334 S.W.3d at 284; *see also Puckett v. Hoover*, 202 S.W.2d 209, 211–12 (Tex. 1947) (deadline to close purchase of mineral interest may be waived and evidence of waiver may be shown by writing, by parole, or from the circumstances or course of dealing); *KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 243 (Tex. App.—Houston [1st Dist.] 1987, writ denied) ("[A] waiver can occur if a party knowingly possessing the right acts in such a manner that the party misleads the opposing party into believing that a waiver has occurred.").

The evidence showed that as with the first closing, difficulty in verifying title caused the second closing to be postponed until October 9, with a third, final closing on November 6. Schrivener testified that she sent a new schedule to Chadwick whereby she proposed the September 17 closing be postponed until October 9. This schedule was also forwarded to Petrohawk's Elkouri and Herod. On September 10, Herod emailed Chadwick asking how he was

---

[19]Question Number 5 states,

> Did Petrohawk waive Plaintiffs' compliance with the September 17, 2008[,] closing date for the July 11, 2008[,] contract?

> Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

39

"coming on the title DD [due diligence] on the next closing (October 9 I believe) . . . ." Herod stayed in contact with RWT to keep abreast of the number of additional mineral acres to be closed on October 9 and the third closing and to make sure the Family agreed on the "acreage splits." In late September, Herod asked the Family that the October 9 closing be moved up to October 8 instead. As late as October 6, internal emails indicated Petrohawk's expectation of closing on the additional acreage. RWT prepared a list of properties for the October 8 closing, showing those mineral interests in which the Family had Defensible Title, totaling about 1,211 net mineral acres. RWT also prepared and forwarded to the Family Exhibit A property descriptions to be attached to the leases closing on October 8. Although Petrohawk characterizes these emails as merely evidence of Petrohawk's continued interest in leasing additional acreage, it does not point to any evidence contrary to the jury's answers. Therefore, this evidence would support an inference by a reasonable jury either that Petrohawk had agreed to extend the September 17 closing to October 9, or that Petrohawk, by its actions and representations, had waived Appellees' compliance with the September 17 closing.

Thus, the weight of the evidence clearly supports the jury's answers finding that the parties extended the September 17 closing date to October 9 and that Petrohawk waived Appellees' compliance with the September 17 closing date. We overrule this point of error.[20]

---

[20]Petrohawk also asserts that the jury's answers to Questions 3 and 5 should be disregarded as immaterial. However, its claim of immateriality is based on its arguments challenging Question 2. Since we have found sufficient evidence to support the jury's answer to Question 2, Questions 3 and 5 remain material and relevant to the jury's verdict. In addition, Petrohawk assails Question 5 as erroneous, arguing that waiver is a defensive theory that "may not be used to create any contractual right or obligations," citing *Miksch v. Exxon Corp.,* 979 S.W.2d 700, 707 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (citing *Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex. 1988)). Petrohawk argues that since the Agreement only provides for a single closing, Appellees cannot rely on waiver to "create" a right to multiple closings. By answering Question 2 in the affirmative, the jury

## 5.      There is Legally Sufficient Evidence of Damages

Petrohawk next complains that the evidence of damages is legally insufficient because Appellees failed to introduce evidence of the market value of the leases as of October 7, 2008. Question 11 instructs the jury to only consider this measure of damage: "[a]s to each tract that you answered 'yes' in Question 9, the difference between $23,500 per net mineral acre and the market value of Plaintiffs' leases on October 7, 2008." The charge then defines "market value" as "the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no compulsion to sell." By its answers, the jury impliedly found that the leases had no market value as of October 7, 2008. Petrohawk claims that Appellees proffered no evidence of the market value of the leases as of that date, attacking the credibility of Appellees' experts and lay testimony.[21] Appellees' primary expert to testify about the damages issue was Curtis Horne, a professional landman with over thirty years' experience and extensive involvement in educating other landmen. Horne had also been on the board of the American Association of Professional Landmen for almost ten years. He testified that due to the financial crisis and the collapse in the price for natural gas, leasing activity in East Texas for the Haynesville Shale stratum came to an abrupt halt in October 2008 and dried up almost overnight. He also testified that the lack of capital for such ventures brought about a situation wherein the only new leasing of oil and gas minerals was due to commitments

found that the parties had agreed to a second closing. Therefore, the contractual right to a second closing was in existence. Both *Hruska* and *Misksch* recognize that waiver is a defensive theory a party may use to preserve existing rights. *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988); *Miksch*, 979 S.W.2d at 707.

[21]Petrohawk also attacked the trial court's use of October 7, 2008, as the relevant date, but failed to preserve this error by not raising this objection in the trial court.

made by the lessees before the crash of the financial markets or due to unit leasing. He further testified that oil and gas minerals in the ground only have a lease value if there is a market for leasing them. He opined that, since in October 2008 there was no market for them, Appellees' leasehold estate in the minerals had no market value. Petrohawk attacks this testimony as being based on an assumption that "is contrary to the undisputed evidence" that there were other companies which were attempting to obtain leases of the Family's mineral interests in October 2008. To bolster its argument, Petrohawk points to an email from Lelia Vaughan to other Family members on October 27, 2008, in which she identified two companies that had indicated interest in leasing their minerals and referenced "many, many" other requests.

When the assumption on which an expert's opinion is based conflicts with undisputed testimony, then the expert's testimony lacks any probative value. *City of Keller*, 168 S.W.3d at 813; *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–00 (Tex. 1995). However, if there is conflicting evidence, this rule does not apply, and the expert's opinion can be considered. *Marvelli v. Alston*, 100 S.W.3d 460, 477–78 (Tex. App.—Fort Worth 2003, pet. denied). Further,

> Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.
>
> Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.

*City of Keller*, 168 S.W.3d at 819 (citations omitted).

42

Here, there was conflicting evidence that could support Horne's testimony. First, although the existence of Lelia Vaughan's email is not contested, the email does not mention when she received the inquiries to which she made reference.[22] Further, an inquiry or request is not precisely the same as an offer to lease. In addition, in explaining the email, Vaughan testified that the "many requests" to which she referred was an overstatement and that the Family did not discuss entering into leases with anyone but Petrohawk. Also, Fort Staggers, vice president of the bank that was trustee of one of the Appellee interests, testified that there had been no interest in leasing all of the tracts from October 2008 until trial. In addition, Petrohawk's Elkouri testified that "[t]he market had changed dramatically" and that "leasing had basically come to a halt." Finally, Horne had conversations with a number of landmen around October 2008 who confirmed the lack of leasing activity in Harrison County.

When evidence is presented that there is no market for a mineral interest, it will support a finding by a jury that there is no market value. *See Lomax v. Henderson*, 559 S.W.2d 466, 468 (Tex. App.—Waco 1977, writ ref'd n.r.e.) (testimony that nonproducing mineral estate had no market value supported trial court's finding of no damages). Although the evidence adduced at trial may be conflicting, it would support Horne's testimony that there was no market value for the leases. Since there is more than a scintilla of evidence that supports the jury's implied

---

[22]In its reply brief, Petrohawk also points to Defendant's Exhibit 275, an email from Ellen Miller which says she has received inquiries on several tracts. However, only one of the tracts is involved in this case and, again, there is no indication of when she received the inquiries.

finding of no market value, the evidence is legally sufficient to support the award of damages. Therefore, we overrule this point of error.[23]

### 6. Petrohawk Waived the Liquidated Damages Provision

Petrohawk also claims that damages should be limited to the $10,000,000.00 liquidated damages provision in paragraph 6 of the Agreement. We have previously noted that the Family fulfilled the conditions precedent at the August 27 closing, an event that required Petrohawk to choose to either go forward with leasing all of the Family's mineral interests fitting the description in the contract or forfeit the $10,000,000.00 as liquidated damages. The liquidated damages provision was a provision that protected Petrohawk in the event that it chose to not lease any of the Family's mineral interests. However, a party to a contract can waive provisions that are to its benefit. *Joiner*, 716 S.W.2d at 610. Since Petrohawk chose to go forward with leasing the Family's mineral interests, it waived the liquidated damages provision.

### C. Attorney Fees

### 1. Petrohawk Failed to Preserve its Section 38.001 Error

Section 38.001 of the Civil Practice and Remedies Code provides that for a claim based on an oral or written contract, "[a] person may recover reasonable attorney's fees from an individual or corporation." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008). Petrohawk asserts that since the Petrohawk parties are a limited partnership and a limited liability company, attorney fees are not authorized to be awarded against them, citing *Fleming & Associates, L.L.P. v. Barton*, 425 S.W.3d 560 (Tex. App.—Houston [14 Dist.] 2014, pet. filed).

---

[23]Since we affirm the award of damages, we need not address Petrohawk's complaints regarding specific performance.

However, Petrohawk failed to preserve this claim of error in the trial court. To preserve a complaint for appellate review, a party must present a timely request, objection, or motion to the trial court that states the specific grounds for the desired ruling. TEX. R. APP. P. 33.1(a); *see State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992); *Holmes v. Concord Homes, Ltd.*, 115 S.W.3d 310, 313 (Tex. App.—Texarkana 2003, no pet.). If a party fails to follow this procedure, error is not preserved. *Holmes*, 115 S.W.3d at 313.

Although Petrohawk objected to the wording and absence of additional instructions at the charge conference, it made no such objection based on the unavailability of attorney fees under Section 38.001. Petrohawk claims that it preserved error in its motion for judgment *non obstante veridicto* by objecting that Question 13 (the question dealing with attorney fees) was immaterial. It reasons that since a complaint that attorney fees are not available under a statute is an assertion of immateriality, it therefore presents the issue of whether it should be submitted. Following that reasoning, Petrohawk maintains that an assertion of immateriality suffices to preserve a complaint that attorney fees are not available under a statute, citing *Arkoma Basin Exploration Co. v. FMF Associates 1990-A, Ltd.*, 249 S.W.3d 380 (Tex. 2008); *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91 (Tex. 1999) (per curiam); *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166 (Tex. 1999); and *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95 (Tex. App.—Houston [1st Dist.] 2013, no pet.).[24] *Holland* held that since the issue of whether attorney fees are available under a particular statute is a question of law, it can be raised for the first time

---

[24]Only *Holland* is directly relevant to this case. In both *Southeastern Pipe Line Co.*, and *Eun Bok Lee*, a proper objection was made at the charge conference. *Se. Pipe Line Co.*, 997 S.W.2d at 172–73; *Eun Bok Lee*, 411 S.W.3d at 114–15. In *Arkoma Basin Exploration Co.*, the court held that the assertion in a post-trial motion that "'there is no evidence . . . to support the jury's answers'" to a jury question was sufficient to preserve an insufficiency of evidence complaint on appeal. *Arkoma Basin Exploration Co.*, 249 S.W.3d at 387.

in a post-trial motion. *Holland*, 1 S.W.3d at 93. However, at trial, Walmart specifically asserted the unavailability of attorney fees under the subject statute. *Id.* In contrast, Petrohawk's motion for judgment notwithstanding the verdict asserted that the jury's answer to Question 13 should be disregarded for two reasons. First, since recovery under Section 38.001 is predicated on prevailing on its breach of contract claim and since there was insufficient evidence to support the jury's findings and a judgment for breach of contract, then attorney fees were not recoverable. Second, Petrohawk asserted that the exclusive remedy provision in paragraph 6 of the Agreement barred recovery of attorney fees under Section 38.001. Subsequent to that and at the end of a paragraph asserting that there is no evidence to support the jury's findings of the amount of attorney fees, Petrohawk averred, "Furthermore, the jury's answers to Question Number 13 are immaterial and also should be disregarded for that reason." To preserve error, "an objection must be clear enough to give the trial court an opportunity to correct it." *Arkoma Basin Exploration Co.*, 249 S.W.3d at 387. There is nothing in Petrohawk's objections to apprise the trial court that Section 38.001 does not authorize attorney fees to be awarded against partnerships and limited liability companies or that the immateriality objection is based on that premise. Rather, a trial court seeing the immateriality objection would naturally relate it back to the two prior objections. Therefore, Petrohawk failed to preserve its error by failing to state its objection "with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1(a)(1)(A).

46

## 2. Attorney Fees

Petrohawk also asserts that the jury's attorney fee award was excessive and not supported by factually sufficient evidence. The jury awarded Appellees fees of $3,500,000.00 through trial, $360,000.00 for an appeal to the court of appeals, and $360,000.00 for oral argument and completion of proceedings in the Texas Supreme Court. Petrohawk claims this award was excessive on the basis that the amount awarded is more than four times the "lodestar" amount of attorney fees.[25] *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 759 (Tex. 2012).

### a. Standard of Review

The determination of the amount of fees that are reasonable and necessary is a question of fact for the jury. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). Factors to be considered in determining the amount of reasonable attorney fees include:

> (1)   the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
> (2)   the likelihood . . . that the acceptance of employment precluded other employment by the lawyer;
> (3)   the fee customarily charged in the locality for similar legal services;
> (4)   the amount involved and the results obtained;
> (5)   the time limitations imposed by the client or by the circumstances;
> (6)   the nature and length of the professional relationship with the client;
> (7)   the experience, reputation, and ability of the lawyer performing the services; and
> (8)   whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.[26]

---

[25]Appellees' counsel testified that based on his standard rate and the hours worked, his fee through trial was $800,000.00, with $200,000.00 in expenses, and estimated his fee, based on hours worked, at $600,000.00 through the court of appeals and $600,000.00 through the Texas Supreme Court.

[26]The jury was instructed to consider these factors in determining a reasonable fee.

47

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (West 2005) (TEX. STATE BAR R., art. X, § 9). When reviewing a jury verdict for factual sufficiency of the evidence, we consider and weigh all the evidence and only set aside the verdict "if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176.

### b. Remand is Required as a Result of the Post-Judgment Remittitur

We do not reach the factual sufficiency question as it relates to the attorney fee award because remand is required as a result of the remittitur ordered by the trial court and accepted by Appellees.[27] *Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam); *Barker v. Eckman*, 213 S.W.3d 306, 315 (Tex. 2006). Both Young and Barber involved remittiturs ordered by a court of appeals that reduced damage awards by sixty-two percent and eighty-five percent, respectively. *Young*, 223 S.W.3d at 313; *Barker*, 213 S.W.3d at 313. In this case, although the remittitur was much smaller, it prevents us from performing a factual sufficiency analysis. When conducting a factual sufficiency challenge, we review the evidence based on the jury charge given. *Barker*, 213 S.W.3d at 313. As noted, the jury was instructed to use the *Arthur Andersen* factors in determining a reasonable attorney fee. *See Arthur Andersen*, 945 S.W.2d at 818. One of the factors was "'the amount involved and the results obtained.'" *See id.* Faced with a similar charge, the Texas Supreme Court in *Barker* held that a factual sufficiency determination was not possible "unless the appellate court is reasonably certain that the jury was not significantly

---

[27]The trial court ordered remittitur totaling $912,767.00 of the damages assessed, which the Family accepted.

48

influenced by the erroneous amount of damages it considered." *Barker*, 213 S.W.3d at 314.  In this case, Appellees' attorney, in giving his opinion about a reasonable attorney fee, testified that "the heaviest factor that I would weigh would be a contingency fee factor.  And our fee agreement is that it's 40 percent through appeal."  When asked about the other factors, he testified about the risk involved in a contingency fee arrangement and stated, "[T]hat's why I weigh the contingent factor the heaviest, but it's only -- it's only one of those factors."  The attorney fees awarded in this case were almost double the amount of the verified and anticipated attorney fees and expenses based on an hourly fee times the amount of hours spent, and calculates to an amount slightly over thirty-four percent of the damages awarded by the jury. Under these facts, we cannot be reasonably certain that the jury was not significantly influenced by the erroneous damages it awarded.[28]  Therefore, a reversal and remand to the trial court for a new trial on the issue of the reasonable amount of attorney fees is required.  *Id.* at 314–15.

---

[28]We note that the size of the remittitur, although small in comparison to the size of the overall award, is not small. Accordingly, about thirty-four percent of the remitted sum would likewise still be a considerable amount of money.

### III.    Conclusion

We affirm that part of the trial court's judgment awarding damages to Appellees for Petrohawk's breach of contract.  We reverse the part of the trial court's judgment as to attorney fees and remand that part of the case to the trial court for further proceedings consistent with this opinion.

Bailey C. Moseley
Justice

Date Submitted:    November 10, 2014
Date Decided:      January 14, 2015