

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00088-CV

_____

RCIS ENTERPRISES, LLC, Appellant

V.

HOUSER FABRICATION, LLC, Appellee

_____

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CV-21-45560

_____

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

RCIS Enterprises, LLC, (RCIS) appeals a part of the trial court's judgment entered following a bench trial in which Houser Fabrication, LLC, (Houser) recovered breach of contract damages in the amount of $78,491.10, prejudgment interest under the Texas Prompt Payment Act, attorney fees, post-judgment interest, and costs.[1] On appeal, RCIS contends that there is legally insufficient evidence supporting the trial court's findings of fact and conclusions of law that (1) the parties entered into a legally enforceable contract, (2) the amount of damages awarded to Houser, and (3) the award of prompt payment interest. RCIS also contends that the trial court erred in awarding Houser attorney fees and that the amount of fees awarded was excessive. RCIS further contends that the trial court erroneously released interpleaded funds to Houser. We find that legally sufficient evidence supports the trial court's findings and conclusions that the parties entered into a legally enforceable contract. However, the evidence is legally insufficient to support the amount of damages, in part, and the award of prompt payment interest. We will remand this case for a new trial on attorney fees, a determination of prejudgment interest, and the entry of a final judgment consistent with this opinion.

**I.      The Trial Court's Finding of a Legally Enforceable Contract is Supported by Legally Sufficient Evidence**

**A.      Standard of Review**

In a legal sufficiency challenge, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v.*

---

[1]In the trial court's judgment, RCIS recovered $10,478.37 and prejudgment interest on its counterclaim for damages related to an unrelated contract (the Bellaire Project). That part of the judgment awarding damages to RCIS was not appealed. The amount of Houser's award was offset by RCIS's award.

*Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). For a bench trial, the trial court's findings of fact "are of the same force and dignity as a jury's answers to jury questions." *.39 Acres v. State*, 247 S.W.3d 384, 387 (Tex. App.—Texarkana 2008, pet. denied) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). As a result, "[w]e review the findings of fact by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question." *Lambright v. Trahan*, 322 S.W.3d 424, 430 (Tex. App.—Texarkana 2010, pet denied) (citing *.39 Acres*, 247 S.W.3d at 387).

In determining legal sufficiency, "we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not." *Ramsay v. Tex. Trading Co.*, 254 S.W.3d 620, 625 (Tex. App.—Texarkana 2008, pet. denied) (citing *City of Keller*, 168 S.W.3d at 827). "[W]e consider the evidence in a light most favorable to the challenged findings, indulging every reasonable inference that supports them, [but] we may not disregard evidence that allows only one inference." *Id.* (citing *City of Keller*, 168 S.W.3d at 822). Also, "we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not." *Id.* (citing *City of Keller*, 168 S.W.3d at 827). Because the trial court is the trier of fact, it "is the sole judge of the credibility of the witnesses and the weight to give their testimony." *Id.* (citing *City of Keller*, 168 S.W.3d at 819).

"When determining whether legally sufficient evidence supports a jury finding, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not." *Albertsons, LLC v.*

3

*Mohammadi*, 689 S.W.3d 313, 318 n.2 (Tex. 2024) (per curiam) (quoting *4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 908 (Tex. 2016)). "The evidence is legally sufficient if [there] is more than a scintilla of evidence on which a reasonable juror could find the fact to be true." *Id.* (alteration in original) (quoting *4Front Engineered Sols., Inc.*, 505 S.W.3d at 909). "More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 770 (Tex. App.—Texarkana 2015, pet. dism'd) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

### B.     Applicable Law

"The requirements of written and oral contracts are the same and must be present for a contract to be binding." *Lloyd Walterscheid & Walterscheid Farms, LLC v. Waltersheid*, 557 S.W.3d 245, 258 (Tex. App.—Fort Worth 2018, no pet.) (citing *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied)). To form a binding contract there must be "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *KW Const. v. Stephens & Sons Concrete Contractors, Inc.*, 165 S.W.3d 874, 883 (Tex. App.—Texarkana 2005, pet. denied) (citing *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ)).

4

"To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)).  At the least, a contract "must . . . be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Id.* (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000)).  Further, "the agreement's terms must . . . be sufficiently definite to 'enable a court to understand the parties' obligations,'" *id.* (quoting *Forth Worth Indep. Sch. Dist.*, 22 S.W.3d at 846), "and to give 'an appropriate remedy' if they are breached," *id.* (RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981) (footnote omitted) (citations omitted)).

However, only "those terms that are 'material and essential' to the parties' agreement" are required to "be definite and certain." *Id.* (quoting *Radford v. McNeny*, 104 S.W.2d 472, 475 (Tex. 1937)).  "[M]aterial and essential terms are those that parties would reasonably regard as 'vitally important ingredient[s]' of their bargain." *Id.* (second alteration in original) (quoting *Neeley v. Bankers Tr. Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985)).  Which terms are material is "determined on a case-by-case basis." *Id.* (quoting *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam)).

The Texas Supreme Court has set forth several principles in analyzing whether a contract is enforceable. *See id.* at 239–40.  The following are those principles applicable to this case. First, "because the law disfavors forfeitures, we will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation." *Id.* at 239.  Concomitant to this principle, "if the parties clearly intended to agree and a 'reasonably certain basis for

5

granting a remedy' exists, we will find the contract terms definite enough to provide that remedy." *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. b). Further,

> [w]hen "the actions of the parties . . . show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon[,] . . . courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain."

*Id.* (second alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. a).

Second, "[p]art performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed." *Id.* at 240 (alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 34(2)). Further, "the parties' actions 'in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 34(3)). Thus, "[w]hen the parties' actions demonstrate that they intended to 'conclude a binding agreement, even though one or more terms . . . are left to be agreed upon . . . , courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(2) cmt. a). "The law favors finding agreements sufficiently definite for enforcement, 'particularly . . . where one of the parties has performed his part of the contract.'" *Id.* (quoting *Tanenbaum Textile Co. v. Sidran*, 423 S.W.2d 635, 637 (Tex. App.—Dallas 1967, writ ref'd n.r.e.)).

**C.    The Evidence at Trial Regarding the Contract**

Garney Companies, Inc. (Garney) was the general contractor for the Lower Bois D'Arc Creek Reservoir Program – Water Treatment Plant and Pump Station Project, Project Numbers 384 and 358 (the "Leonard Project"). In March 2020, Garney entered into a subcontract with

6

RCIS to perform steel-erection work for the Leonard Project. The original contract price was $348,800.00 for RCIS's scope of work.

Scott Houser (Scott), Houser's owner, had known the owner of RCIS, Benjamin Castro, since 2015. Scott testified that Houser had done five or six steel-erection projects for RCIS, including the Leonard Project. According to Scott, in early October 2020, Castro called Scott and said he had started the Leonard Project but might need Houser to finish it because Castro was having trouble with his crew.[2] On the morning of October 19, RCIS lost all of its workers on the Leonard Project. Later that day, Castro began negotiations with Houser to finish the structural steel work on the Leonard Project.[3] Within the next few days, Castro provided Houser with the steel-erection drawing submittals from HME, Inc. (HME),[4] which detailed the steel-

---

[2]Garney's daily reports for the Leonard Project state that RCIS had two welders and one helper working on October 1 thru October 5, 2020. The reports state that RCIS had one welder and one helper working on October 6 thru October 9. From October 13 thru October 16, the reports state that RCIS had one welder and four workers at the worksite. Regarding RCIS, the report for Monday, October 19, states, "Lost all workers by 10am. Should have more welders tomorrow. Working at East Chem deck." Also, for RCIS, the reports from October 20 thru October 22, state, "Working at East Chem deck," but do not indicate whether any welders or other workers were present. The report for October 27, also states, "RCIS to have a full crew on Monday to erect East Chem canopies."

[3]Scott explained that there were four buildings in the Leonard Project called the north chemical, east chemical, west chemical, and lime. He described the project as follows:

> You had tilt wall buildings that are essentially concrete walls that are stood up by another contractor. And inside of those buildings, you have what we call bar joists that basically make up the roof structure for those enclosed buildings. And then on top of the bar joists, you get what we call B decking, and it's just a decking -- decking materials that go down. And then they're not a waterproof barrier. They then come back and lay the -- another contractor will come back and lay the waterproof barrier on top of the decking that we install, as well as the galvanized canopies that are outside that were connected to the concrete tilt wall buildings. Those needed to be installed as well.
>
>     That was the -- the full scope of the project for Ben and [Scott].

[4]HME was the manufacturer of all of the steel for the Leonard Project.

erection work for the Leonard Project.[5]  Castro never gave Houser a copy of RCIS's contract with Garney.

In determining the scope of work, Scott asked Castro, by text message, whether the exterior wall panels were in Houser's scope of work.  Castro replied, "Nope.  Steel only."  Scott explained that he was referring to the fascia and panels attached to the canopies depicted on the HME drawings and that the reason he asked was because a qualified person was required to install them.  He also explained that the panels were metal cladding that goes on the exterior of the building and that they were "outside [the] normal structural steel scope."  A few minutes after telling Scott that the scope of work was steel only, Castro sent Scott a text message stating, "You have the construction drawings.  That's the metal packages."

Based on the information Castro gave Scott, and his inspection of the project, Scott offered to finish the steel-erection work for $180,000.00.  He testified that he based his offer on the square footage, the bid of his subcontractor, Steel Ruiz,[6] and equipment and crane rentals. Scott testified that by October 27, Houser and RCIS had come to an agreement that Houser would complete the remaining steel-erection work for $180,000.00 and that Houser would cover the cost of equipment and cranes.  On November 3, Castro sent text messages to Scott stating,

---

[5]Scott testified that initially he was not provided with the full set of drawings but that Castro explained to him the scope of work on the north chemical building.

[6]Houser subcontracted with Steel Ruiz to provide the labor for the steel-erection work.  Scott testified that Steel Ruiz gave him an initial offer "not to exceed" $117,000.00 and that its final price was $80,500.00.

"Keep it at $180k. You must provide allll [sic] equipment. And we will have a signed contract[.][7] If a crane is needed, like you said, then provide it."

On October 27, Steel Ruiz's crew began working on the Leonard Project. By November 19, according to Scott, seventy-five percent of the work was done, and Houser sent its first pay application to RCIS.[8] Scott testified that before the pay application was sent, he confirmed with Castro and Garney's superintendent, Dana Savidge, that they agreed on the percentage. Steel Ruiz worked on the Leonard Project through December 11. Scott explained that Steel Ruiz was not able to complete a section of the west chemical building upper canopy and the lower canopy because of manufacturer deficiencies, and a small canopy at the north chemical building because it had been fabricated incorrectly. He testified that if RCIS had asked Houser to return to the jobsite and finish the steel-erection work, it would have done so. On December 12, RCIS paid Houser $65,000.00 on its first pay application.

Houser sent its second pay application to RCIS on December 18, for work performed on the Leonard Project from November 19 to December 17. At that time, Houser estimated that it had completed ninety-five percent of the steel-erection work. The total amount requested was $102,675.00, which included both the $56,500.00 not paid on the first pay application and a $5,500.00 change order. Scott also testified that on November 18, RCIS invoiced Garney a net

---

[7]Scott testified that he normally required a signed contract before starting work. On the Leonard Project, although Castro said they would have a written contract, he never sent one to Scott despite Scott's repeated requests to send him one. Scott testified that when he asked Castro for a contract, Castro "either sidestepped" the issue, said he would have it in a few days, or said he was out of the office. Text messages between Scott and Castro sent in October, November, and December 2020, support Scott's testimony.

[8]The first pay application requested payment of $121,500.00, which was seventy-five percent of $180,000.00 less ten percent retainage (($180,000.00 x 75%) less $13,500.00 retainage).

amount of $132,739.35 and that on December 1, RCIS invoiced Garney a net amount of $61,750.00. He noted that those amounts were very similar to the amounts Houser had requested from RCIS in its two pay applications.

Castro acknowledged that RCIS sent a pay application to Garney for work performed through October 15 and represented that thirty-four percent of its steel-erection work was complete. He also acknowledged that RCIS sent a pay application to Garney for work through November 15 and represented that seventy-four percent of the steel-erection work was complete. For work done December 1 through December 15, he acknowledged that RCIS represented on its pay application that ninety-two percent of the steel-erection work was complete.

Castro admitted that he did not provide Houser a copy of RCIS's contract with Garney before Houser began working on the Leonard Project. However, he maintained that grout work under the steel columns, the exterior horizontal ribbed metal wall panels, and supervision of Houser's crew[9] were included in Houser's scope of work because those items were included in RCIS's scope of work under its contract with Garney. He also testified that Scott's inquiry regarding the exterior wall panels was referring to the tilt wall concrete panels.

### D.    Analysis

In its first issue, RCIS contends that there is no evidence of a meeting of the minds by the parties on the essential terms of the contract. Specifically, RCIS contends that there is no

---

[9]At trial, Castro testified that he supervised Houser's crew in November and December because Houser did not. The only text message that he relied on in support of that contention was a text message he sent to Houser on February 12, 2021, stating, "You didn't have 1 guy from your company to foreman like you said you were going too [sic]. I was there every week." Rafael Ruiz, who worked on the Leonard Project for Steel Ruiz, testified that Castro was at the worksite "almost every day." However, he testified that Castro only observed who was working and never instructed the Steel Ruiz crew about how to do their work or where they should work.

evidence that there was a meeting of the minds on the scope of Houser's work. RCIS points to portions of Scott's testimony it contends establishes the terms of Houser's scope of work were not sufficiently defined. It also relies on Castro's testimony that Houser's scope of work was broader than the scope of work identified by Scott.

"Whether there was a meeting of the minds is based on an objective standard of what the parties said and did rather than their subjective state of mind." *Ho v. Benco Mach., LLC*, No. 06-20-00061-CV, 2020 WL 7268586, at *3 (Tex. App.—Texarkana Dec. 11, 2020, no pet.) (mem. op.) (quoting *Moe's Home Collection, Inc. v. Davis St. Mercantile, LLC*, No. 05-19-00925-CV, 2020 WL 3637623, at *2 (Tex. App.—Dallas July 6, 2020, no pet.) (mem. op.)). Further, "evidence of a party's subjective misunderstanding has no bearing on the definiteness of the agreement, which is an objective inquiry." *Id.* at *4 (quoting *Moe's Home Collection, Inc.*, 2020 WL 3637623, at *4).

Initially, we note that at trial, although Castro disagreed about the scope of work Houser was obligated to perform, he did not deny that RCIS and Houser had an agreement that Houser would finish the steel-erection work on the Leonard Project. To determine whether there was more than a scintilla of evidence that the parties had a meeting of the minds regarding Houser's scope of work, we look not only to the parties' testimony, but to the other relevant evidence introduced at trial: the text messages between the parties, HME's steel-erection drawings, and the parties' conduct and experience.

Both parties were experienced in steel-erection work and had worked on other steel-erection projects together. The evidence shows that during their discussions of the Leonard

11

Project, Castro sent Scott HME's steel-erection drawings, which showed the details of the steel components and the erection of the buildings. When Scott had questions regarding the scope of work and dimensions of the buildings, Castro replied, "You have the construction drawings. That's the metal packages," and instructed Scott to "[g]o off the construction drawings." That is evidence that both parties understood that the scope of Houser's work would be determined by the construction drawings that Castro supplied to Scott.[10] The only exception to the work shown on the drawings was the exterior wall panels that were to be connected to the canopies, about which Scott specifically asked, and Castro replied that they were not in RCIS's scope of work.[11] Both parties agreed that Houser would also pay for all equipment and any cranes used by Houser on the project, as evidenced by their text messages. Finally, the evidence shows that Houser and Steel Ruiz performed all of the steel-erection work they could from October 27 through December 11, without any complaint from RCIS that Houser was not complying with the scope of work under the agreement.

On this record, we find that more than a scintilla of evidence supports the trial court's implied finding that the parties had a meeting of the minds regarding the scope of Houser's work

---

[10]The HME construction drawings state:

**FOR FIELD USE**
**FINAL PLANS**
**NOTE TO CONTRACTOR AND ERECTOR**
**RESPONSIBILITY FOR FIELD MODIFICATIONS OF**
**ADDITIONAL MATERIAL WILL NOT BE**
**ACCEPTED UNLESS PREVIOUSLY AUTHORIZED**
**BY HME, INC.**

[11]Although Castro testified that Scott's inquiry about exterior wall panels was referring to the tilt wall concrete panels, the trial court, as fact-finder, "is the sole judge of the credibility of the witnesses and the weight to give their testimony." *Ramsay*, 254 S.W.3d at 625. As a result, it could have given more weight to Houser's testimony that the reference was to the metal panels that were to be connected to the canopies.

12

on the Leonard Project. As a result, legally sufficient evidence supports the trial court's implied finding. We overrule RCIS's first issue.

## II. Legally Insufficient Evidence Supports the Trial Court's Damages Findings, in Part

RCIS's second issue challenges the legal sufficiency of the evidence supporting the trial court's findings on damages and RCIS's affirmative defense of waiver and release. RCIS argues that the evidence conclusively establishes that Houser waived and released any claim for unpaid work covered under its first pay application, except the unpaid retainage. It also argues that no evidence supports the trial court's damages findings because Houser presented no evidence of the reasonable cost to complete the work it contracted to perform, to remedy the alleged defects in its work, or of equipment and crane rental and fuel charges. We will address these arguments separately.

### A. Conclusive Evidence Established Waiver and Release of Unpaid Balance of the First Pay Application

#### 1. Evidence Relating to Waiver and Release

As discussed above, on November 19, Houser sent its first pay application to RCIS. In the application, Houser claimed that seventy-five percent of the steel-erection work was complete, and billed RCIS seventy-five percent of $180,000.00 ($135,000.00), less ten percent retainage ($13,500.00), for a net of $121,500.00. On December 12, RCIS paid Houser a progress payment of $65,000.00. In return, on behalf of Houser, Scott executed an "UNCONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT" (the Release) that provided, in relevant part:

Project **Leonard WTP**

13

Job No. _____

The signer of this document has been paid and has received a progress payment in the sumof [sic] $**65,000.00** for all labor, services, equipment, or materials furnished to the property or to **RCIS Enterprises, LLC.** on the property of **North Texas Municipal** (owner) located at **361 County Rd. 4965** (location) to the following extent: **Steel Erecting/Welding** (job description). The signer therefore waives and releases any mechanic's lien right, any right arising froma [sic] payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim orpayment [sic] rights for persons in the signer's position that the signer has on the above referenced project to the following extent:

This release covers a progress payment for all labor, services, equipment, or materials furnished to the property or to **RCIS Enterprises, LLC..** [sic] as indicated in the attached statement(s) or progress payment request(s), except for unpaid retention, pending modifications and changes, or other items furnished.

. . . .

**NOTICE: THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM.**

Date _12-11-2020_____
      Houser Fabrication, LLC_____(Company name) By
      [/s/Scott Houser]_____(Signature)
      Owner_____(Title)

The undisputed evidence at trial established that the $65,000.00 progress payment was toward Houser's first pay application and that it was the only monies Houser received from RCIS on the Leonard Project.

On December 18, Houser sent its second pay application to RCIS for work performed on the project from November 19 to December 17. That pay application represented that ninety-

five percent of the steel-erection work was completed, billed RCIS ninety-five percent of $180,000.00 ($171,000.00), plus $5,500.00 for a change order, less five percent retainage ($8,825.00), and less the previous payment ($65,000.00), for a net amount of $102,675.00. In other words, the net amount included $56,500.00 that was withheld from the first pay application.

In its original answer and original counterclaim, RCIS asserted the affirmative defenses of waiver and release.

### 2. Findings of Fact and Conclusions of Law Relevant to Waiver and Release

The trial court entered the following findings of fact relevant to the waiver and release issue:

22. On December 11, 2020, the value of Houser's unpaid work, less offsets for equipment, was $78,491.10.

. . . .

30. The total amount of the work to be performed by Houser on the Leonard job was $180,000.00 less work not performed by Houser ($18,414.48) and a credit for equipment ($18,094.42). $180,000.00-$18,414.48-$18,094.42 = **$143,491.10.**

. . . .

32. On Nov[ember] 19, 2020[,] Houser emailed its first payment application and certificate for payment to RCIS, therein billing for unpaid work in the amount of $121,500.

. . . .

35. On December 11, 2020, RCIS paid Houser $65,000.00, leaving a balance owed of $56,500.00.

36. RCIS never issued any further payments to Houser on the Leonard [P]roject.

37. Houser's principal damages are calculated as the net amount for which it billed (after deductions for work not performed and an equipment credit) of $143,491.10 - $65,000.00 paid by RCIS = Principal Damages of **$78,491.10.**

15

38.  On December 17, 2020, Houser issued an invoice to RCIS in the amount $102,675.00, which represent[ed] a carry-forward amount owed from the previous invoice of $56,500.00, plus new work for $46,175.00.

. . . .

42.  Prompt pay interest of 18% on $56,500.00 from 12/21/2020 through 8/21/2023 (973 days at $27.86/day) = $27,107.78.

. . . .

44.  Houser has been damaged for RCIS's failure to pay the net sum due to Houser of $78,491.10.

. . . .

65.  Houser did not release any claims or defenses in this lawsuit.

66.  Houser's application of the payment it received from RCIS did not prejudice either RCIS, or Houser's ability to assert the claims and defenses it brought in this lawsuit.

. . . .

70.  Houser did not act in a manner as to intentionally surrender any known right, claim, cause of action, or defense regarding the Leonard Project.

71.  Houser did not engage in intentional conduct inconsistent with claiming any right or asserting any claim, cause of action, or defense regarding the Leonard Project.

Relevant to the waiver and release issue, the trial court entered the following conclusions of law:

9.  Houser substantially performed its work at the project.

10.  Because Houser substantially performed its work, it is entitled to full payment under the Leonard [c]ontract less the value of its unperformed work and rental equipment provided by RCIS.

. . . .

15.  RCIS's affirmative defenses asserted against Houser are without merit and should be denied in their entirety.

### 3.      Standard of Review and Applicable Law

"When a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which [it] has the burden of proof, [it] must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Pettit v. Tabor*, No. 06-19-00002-CV, 2020 WL 216025, at *8 (Tex. App.—Texarkana Jan. 15, 2020, pet. denied) (mem. op.) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per

16

curiam)).  "To prevail on appeal, the party must first show that no evidence supported the trial court's finding and then, if there was none, that the evidence conclusively established the finding urged by the party."  *Id.* (citing *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 557 (Tex. 2015)).  "To determine whether no evidence supported the finding, we 'first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary.'"  *Id.* (quoting *Dow Chem. Co.*, 46 S.W.3d at 241).  "If no evidence supports the finding, then we 'examine the entire record to determine if the contrary proposition is established as a matter of law.'"  *Id.* (quoting *Dow Chem. Co.*, 46 S.W.3d at 241).

At trial, it was undisputed that Scott signed the Release on behalf of Houser in exchange for the $65,000.00 payment on its first pay application.  "A release is a contract, so we construe it as such."  *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 339 (Tex. 2023).  "The construction of an unambiguous contract is a question of law which we review de novo."  *Petrohawk Props., L.P.*, 455 S.W.3d at 765 (citing *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)).  "When the contract is unambiguous, 'the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls.  Generally[,] the parties to an instrument intend every clause to have some effect and[,] in some measure[,] to evidence their agreement.'"  *Id.* (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)).  "[A]ll the usual 'rules of construction' apply, like the familiar presumptions favoring consistent usage, disfavoring surplusage, and using the plain meaning of undefined terms."  *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (alteration in original) (quoting *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228,

17

236 (Tex. 2022)).  "[W]e examine the entire [Release] and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent."  *Id.* (first alteration in original) (quoting *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020)).  "Further, when construing a contract, a court is 'to take the wording of the instrument, consider the same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract.'"  *Petrohawk Props., L.P.*, 455 S.W.3d at 765 (quoting *City of Pinehurst*, 432 S.W.2d at 519).  Nevertheless, evidence of the surrounding circumstances "may only be used to aid the understanding of an unambiguous contract's language, not change it or 'create ambiguity.'"  *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757 (Tex. 2018) (citing *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 688 (Tex. 2017)).

"[T]o effectively release a claim in Texas, the releasing instrument must 'mention' the claim to be released.  Even if the claims exist when the release is executed, any claims not clearly within the subject matter of the release are not discharged."  *Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) (quoting *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 204 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.)).

### 4. Analysis

At trial, Scott did not dispute that he signed the Release on behalf of Houser in exchange for the $65,000.00 payment on its first pay application.  Rather, the only evidence was that he did so.  As a result, unless the Release was ineffective to release any claims by Houser, there is

no evidence to support the trial court's finding that Houser did not release any claims or defenses.

As the Texas Supreme Court has noted, "[t]he purpose of progress payment releases is to ensure that the contractor will not accept payment for work performed and then insist on additional payment for that work." *Zachry Constr. Corp. v. Port of Houston Auth. of Harris Cnty.*, 449 S.W.3d 98, 119 (Tex. 2014). A release "operates to extinguish the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter." *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993) (citing *Hart v. Traders & Gen. Ins. Co.*, 189 S.W.2d 493, 494 (Tex. 1945)).

As relates to Houser's claims against RCIS, under the plain language of the Release, in exchange for a $65,000.00 "progress payment for all labor, services, equipment, or materials" it furnished to RCIS on the Leonard Project related to "**Steel Erecting/Welding**," Houser waived and released any claim for payment that it had on the Leonard Project to the extent the claim was "for labor, services, equipment, or materials furnished to the property or to **RCIS Enterprises, LLC..** [sic] as indicated in the attached statement(s) or progress payment request(s)," except for unpaid retention.

RCIS argues that the Release extinguished Houser's actions against it for breach of contract and quantum meruit insofar as those actions were for unpaid labor, services, equipment, or materials covered by Houser's first pay application, except for unpaid retainage. In its brief, Houser only argues that the Release "makes it clear that any release therein is limited in scope to work already performed, as indicated in any attachment." Left unaddressed by both parties are

19

the fact that there was no document attached to the Release and how the lack of an attachment affects the scope of the Release.

Nevertheless, the undisputed evidence in this case establishes that at the time the Release was executed, Houser had only submitted its first pay application. It is also undisputed that the $65,000.00 payment was on Houser's first pay application and that it was the only payment Houser received from RCIS related to the Leonard Project.

Considering the wording of the Release, "in the light of the[se] surrounding circumstances," we conclude, as a matter of law, that under the Release, Houser waived and released any claim for additional payment covered by its first pay application, except for unpaid retainage. *See Petrohawk Props., L.P.*, 455 S.W.3d at 765 (quoting *City of Pinehurst*, 432 S.W.2d at 519). As a result, the Release extinguished Houser's breach of contract and quantum meruit actions asserted against RCIS, to the extent it claimed damages for unpaid labor, services, equipment, or materials covered by Houser's first pay application, except for unpaid retainage.

We find that the evidence establishes as a matter of law that Houser released and waived any claim for additional payment covered by its first pay application, except for unpaid retainage, i.e. the unpaid $56,500.00. We sustain RCIS's second issue, in part. As a result, we will reduce the actual damages award by $56,500.00.[12]

---

[12]Houser also contends that RCIS waived its complaint that Houser released its claim to future payments by executing the first pay application because it did not make this argument to the trial court. However, RCIS did not make this complaint on appeal. To the extent Houser contends that RCIS waived its complaint that Houser released and waived its claim for payment of the unpaid balance of the first pay application, we note that the record shows RCIS asserted the affirmative defenses of release and waiver and presented evidence in support of those defenses. Also, the trial court made findings of fact regarding those defenses, which shows the trial court was aware that RCIS was asserting and relying on them. Under this record we find that RCIS did not waive its complaint on appeal.

**B.    Legally Sufficient Evidence Supported the Other Damage Findings of Fact**

RCIS challenges the remainder of the damages awarded to Houser because, it argues, "Houser presented no evidence of the *reasonable* cost to complete the work [Houser] agreed to perform, the *reasonable* cost to remedy the defects in [Houser's] work, [and] the reasonable equipment-rental and crane expenses" incurred for Houser's work.  We disagree.

**1.    Applicable Law and Standard of Review**

A contractor who has substantially performed its building contract is entitled to recover "the contract price, less the reasonable cost of remedying the defects or omissions in such a way as to make the building conform to the contract."  *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984) (quoting *Atkinson v. Jackson Bros.*, 270 S.W. 848, 850 (Tex. Comm'n App. 1925, holding approved)).  "This deduction measures the damages allowed the owner for failure on the part of the contractor to fully comply with the specifications."  *Id.* (quoting *Atkinson*, 270 S.W. at 850).  Because Houser asserted an affirmative claim for relief, it had the burden to prove each element of its claim, including the reasonable cost of remedying the defects and omissions of its work.  *See id.*  Nevertheless, it was not required to prove the exact amount of the cost.  Rather, it was required to produce sufficient evidence "to afford [the fact-finder] a reasonable basis for determining" the reasonable cost.  *Id.* at 484.

In this case, the trial court made a finding of fact that "RCIS is entitled to an offset of $18,094.42 for equipment it provided for the Leonard Project" and an implied finding of fact that

21

the reasonable cost for remedying the defects and omissions of its work was $18,414.48.[13] "When determining whether legally sufficient evidence supports a [fact] finding, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not." *Albertsons, LLC*, 689 S.W.3d at 318 n.2 (quoting *4Front Engineered Sols., Inc.*, 505 S.W.3d at 908). "The evidence is legally sufficient if [there] is more than a scintilla of evidence on which a reasonable juror could find the fact to be true." *Id.* (alteration in original) (quoting *4Front Engineered Sols., Inc.*, 505 S.W.3d at 909). "More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *Petrohawk Props., L.P.*, 455 S.W.3d at 770 (citing *Havner*, 953 S.W.2d at 711). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Chapman*, 118 S.W.3d at 751 (quoting *Kindred*, 650 S.W.2d at 63).

### 2. Analysis

As noted above, Scott testified that one of the terms of Houser's contract with RCIS was that Houser would be responsible for the cost of the equipment and crane rental attributable to Houser's work. In explaining what was due under the contract, Scott testified that the equipment and crane rentals attributable to Houser, as well as the fuel costs, should be deducted from what was due under the contract. In its brief, RCIS acknowledges that Scott testified that the amount of those items was $18,094.42. RCIS does not challenge the sufficiency of Scott's testimony

[13]The trial court entered the following finding of fact:

> 68. RCIS is entitled to a credit in the amount of $18,414.48 for work not performed by Houser on the Leonard Project.

regarding the actual cost of those items. Rather, it faults Houser for "present[ing] no evidence that $18,094.42 represented the *reasonable* equipment-rental and crane expenses and fuel charges that RCIS incurred for Houser's work on the Leonard [P]roject." (Emphasis added).

However, because Houser was entitled to recover its "contract price, less the reasonable cost of remedying the defects or omissions in such a way as to make the building conform to the contract," *see Vance*, 677 S.W.2d at 482 (quoting *Atkinson*, 270 S.W. at 851), Houser's burden of proof included establishing what was owed under the contract. Since Houser was responsible under the contract for the rental cost of the equipment and crane, and the fuel expenses attributable to its work, RCIS was entitled to an offset against what was owed under the contract for the rental and fuel expenses it incurred that were attributable to Houser's work. As a result, Houser's burden was to establish the actual cost of the equipment and crane rental and the fuel costs, not the reasonable cost of those items.

Houser also provided sufficient evidence to give the trial court a reasonable basis for determining the reasonable cost of remedying its defects or omissions of its work. Scott testified that the Steel Ruiz crew left the Leonard Project because it was not able to complete a section of the west chemical building upper canopy and the lower canopy because of manufacturer deficiencies, and a small canopy at the north chemical building because it had been fabricated incorrectly. He estimated that at that time, Houser had completed 92.4 percent of its scope of work. Scott also estimated that the total square footage that Houser was not able to complete was 2,500 to 2,700 square feet.

23

Scott also testified that he based his bid at $7.70 per square foot, which he opined was the market value.[14] He testified that Houser's base minimum was $7.15 per square foot, and that RCIS's price was $12.00 to $13.00 per square foot. He also testified that Steel Ruiz initially bid the labor for $117,000.00 and ultimately completed the work for $80,500.00.

Although Scott never testified regarding the exact cost to complete Houser's scope of work, he provided the trial court with a description of the items that had not been completed, the approximate square footage of those items, the per-square-foot charges of both Houser and RCIS, and the amount Steel Ruiz was paid for completing approximately ninety-two percent of Houser's scope of work. The trial court's finding of the reasonable cost of remedying the defects and omissions in Houser's work fell within that testimony.[15] As a result, we find that Houser produced sufficient evidence to give the trial court a reasonable basis to determine the reasonable cost for remedying the defects and omissions of its work. We overrule RCIS's second issue, in part.

## III. Houser Was Not Entitled to Prompt Payment Interest

In its judgment, the trial court awarded Houser prompt payment interest in the amount of $33,423.65. The judgment recites that it arrived at this amount as follows:

---

[14]Scott testified that he had estimated over one hundred erection projects, similar to Leonard, and that he was familiar with the typical charges for those types of projects. He based his familiarity on conversations with others in the same field and on bid tabulations from projects that give the amounts bid by each contractor on the projects.

[15]The fact-finder "generally has discretion to award damages within the range of evidence presented at trial." *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 713 (Tex. 2016) (citing *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002)).

24

(a)     prompt pay interest of 18% on $65,000 [sic] from 12/21/2020 through 7/27/2023 (947 days at $32.05/day) = $30,351.35 [sic][16]

(b)     prompt pay interest of 18% on the remaining $13,491.10 ($78,491.10 - $65,000[.00]) from 4/21/22 through 7/27/2023 (462 days at $6.65/day) = $3,072.30.

RCIS asserts that the trial court erred in awarding prompt payment interest on the unpaid amount under the first pay application because, among other things, Houser waived and released its rights to the unpaid balance, except unpaid retainage. It asserts that the trial court erred in awarding prompt payment interest on the unpaid retainage and the balance owed under the second pay application because RCIS never received payment from Garney for those items, as required by Section 28.002(c) of the Texas Property Code. *See* Tex. Prop. Code Ann. § 28.002(c). For these reasons, RCIS asserts that there is legally insufficient evidence supporting the trial court's findings of fact in support of its prompt payment interest award.

## A.     Applicable Law

Section 28.002(c) provides, in relevant part:

(c)     A subcontractor who receives a payment . . . from a contractor in connection with a contract to improve real property shall pay each of its subcontractors the portion of the payment, including interest, if any, that is attributable to work properly performed . . . as provided under the contract by that subcontractor, to the extent of that subcontractor's interest in the payment. The payment required by this subsection must be made not later than the seventh day after the date the subcontractor receives the contractor's payment.

Tex. Prop. Code Ann. § 28.002(c). Thus, under the statute, a subcontractor that *receives a payment from a contractor* must "pay each of its subcontractors the portion of th[at] payment"

---

[16]As noted above, the trial court's findings of fact state, "On December 11, 2020, RCIS paid Houser **$65,000.00**, leaving a balance owed of $56,500.00," and "[p]rompt pay interest of 18% on $56,500.00 from 12/21/2020 through 8/21/2023 (973 days at $27.86/day) = $27,107.78." The trial court's judgment mistakenly based its award on the $65,000.00 prior payment, rather than the $56,500.00 balance it found was owed under the first pay application.

that is attributable to the work performed by its subcontractor no "later than the seventh day after the date the subcontractor *receives the contractor's payment*." *Id.* (emphasis added); *see Henry Bldg., Inc. v. Milam*, No. 05-99-01400-CV, 2001 WL 246882, at *3 (Tex. App.—Dallas Mar. 14, 2001, pet. denied) (not designated for publication). If the subcontractor fails to timely pay its subcontractor, the "unpaid amount bears interest at the rate of 1 ½ percent each month." TEX. PROP. CODE ANN. § 28.004(b).

### B. Analysis

Because we have previously held that Houser waived and released its claim to any unpaid amounts under the first pay application, except unpaid retainage, RCIS was not liable under Section 28.002(c) for prompt payment interest attributable to these unpaid amounts. As a result, we find that legally insufficient evidence supports the trial court's award of $30,351.35 based on these unpaid amounts.

Regarding the remaining amounts, in order to show that RCIS was liable for prompt payment interest, Houser was required to show that (1) RCIS received a payment from a Garney, (2) a portion of which was attributable to work properly performed by Houser covered by the unpaid retainage in the first pay application and covered by the second pay application, and (3) RCIS failed to pay Houser within seven days after it received payment from Garney. *See* TEX. PROP. CODE ANN. §§ 28.002(c), 28.004(b). Thus, under the statute, RCIS's liability was only triggered if it *received* a payment from Garney that was attributable to work performed by Houser and it failed to pay Houser within seven days of its receipt of the payment.

26

Because the statute does not define "receives," "we will use the plain and ordinary meaning of the term and interpret it within the context of the statute." *Tex. Health & Hum. Servs. Comm'n v. Est. of Burt*, 689 S.W.3d 274, 280 (Tex. 2024) (quoting *Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021)). The plain and ordinary meaning of "receive[s]" is "to come into possession of: ACQUIRE." *Receive*, MERRIAM—WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003); *see Receive*, BLACK'S LAW DICTIONARY (10th ed. 2019) ("To take (something offered, given, sent, etc.); to come into possession of or get from some outside source."). Thus, Houser had to show that RCIS came into possession of a payment from Garney that was attributable to work performed by Houser covered by the unpaid retainage in the first pay application and covered by the second pay application.

Castro testified that the last payment RCIS received from Garney for Houser's work was on December 10, 2020, from which Houser was paid $65,000.00 on the first pay application. Houser offered no evidence to contradict that testimony, and it does not dispute it on appeal. The evidence also shows that on December 16, 2021, Garney interpleaded $86,649.19 into the registry of the court. Garney represented it owed those funds to RCIS under their contract for the Leonard Project, and for which amount Houser alleged was due it from RCIS. Those funds remained in the registry of the court until November 3, 2023, when the funds were released to Houser pursuant to the trial court's order.

Because the record shows that RCIS never received, or came into possession of, a payment from Garney that was attributable to work performed by Houser covered by the unpaid retainage in the first pay application and covered by the second pay application, we find that

27

legally insufficient evidence supports the trial court's award of the remaining $3,072.30 of prompt payment interest.

We sustain this issue, and we will strike the trial court's award of $33,423.65 in prompt payment interest from the trial court's judgment.[17]  Nevertheless, because Houser pleaded for "pre-judgment . . . interest . . . at the highest rate allowed by law," we will remand this case for a determination of this issue.

## IV.  Attorney Fees

### A.  The Trial Court Did Not Abuse its Discretion in Finding a Lack of Unfair Surprise or Prejudice

RCIS also challenges the trial court's award of attorney fees for Houser.  It asserts that the trial court abused its discretion in allowing Houser's attorney-fee evidence because the record does not support the trial court's finding that RCIS was not unfairly surprised or prejudiced by Houser's failure to disclose documentation of its attorney fees before trial.

#### 1.  Background

The trial of this case began on April 3, 2023.  Approximately three months earlier, RCIS served requests for production and interrogatories and requested, among other things, documents supporting Houser's claim for attorney fees, including the resume of each person called to testify concerning the claim, and documents showing the itemization of attorney fees and costs, and the identities of persons for whom attorney fees were sought.  On February 8, 2023, Houser responded to the requests and interrogatories, produced no documents, and indicated that it would "provide relevant documents in compliance with all required pre-trial deadlines regarding

---

[17]Because we sustain this issue, we need not address RCIS's other arguments.

28

exhibits." It is undisputed that Houser did not produce any documents related to its claim for attorney fees before the trial began.

Before the trial began on April 3, the parties and the trial court agreed that the issue of attorney fees would be taken up after the determination of the outcome of the substantive case. The trial of the substantive case concluded on April 12. On April 27, Houser filed its motion to reopen evidence to present evidence in support of its claim for attorney fees, and it served the motion on RCIS. Attached to the motion was the resume of Houser's attorney, Karen Ensley, her affidavit in which she gave detailed testimony in support of Houser's claim for attorney fees, and billing records. The billing records contained itemized descriptions of the work performed, the date it was performed, the hours worked, hourly rate, dollar amounts billed, the name of the person performing the work, and whether it pertained to the Leonard Project or to the Bellaire Project.

On May 26, RCIS filed its response opposing the motion to reopen evidence, and the trial court, after a hearing, granted the motion to reopen evidence. After a hearing on June 23, the trial court awarded Houser its attorney fees.

### 2. Applicable Law and Standard of Review

"Under Rule 193.6 of the Texas Rules of Civil Procedure, when a party fails to timely [make, amend, or] supplement a discovery response, the untimely disclosed evidence may be excluded." *In re D.W.G.K.*, 558 S.W.3d 671, 679 (Tex. App.—Texarkana 2018, pet. denied) (citing TEX. R. CIV. P. 193.6(a)). "Exclusion is mandatory and automatic unless the court finds that there was good cause for the failure to [make,] amend or supplement, or the failure will not

29

unfairly surprise or prejudice the other party." *Id.* (citing TEX. R. CIV. P. 193.6(a); *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297–98 (Tex. 1986) (per curiam); *Good v. Baker*, 339 S.W.3d 260, 271 (Tex. App.—Texarkana 2011, pet denied)). "The party seeking to introduce the evidence has the burden of establishing good cause or lack of unfair surprise or prejudice." *Id.* (citing TEX. R. CIV. P. 193.6(b); *Baker*, 339 S.W.3d at 271).

"The trial court has discretion to determine whether the offering party has met its burden to show good cause or lack of unfair surprise or prejudice, and the record must support such finding." *Id.* (citation omitted) (citing TEX. R. CIV. P. 193.6(b)). The trial court's finding may be supported by evidence in the record, "counsel's uncontested representations . . . as to the state of discovery in the case," and "counsel's statements made in open court without any objections . . . if the trial court credits them." *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023) (per curiam). We "review[] a trial court's decision under Rule 193.6(a) for abuse of discretion." *Id.* (citing *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam)).

### 3. Analysis

In *In re D.W.G.K.*, we noted that

> in order to establish the absence of unfair prejudice, the party seeking to call an untimely disclosed witness or introduce untimely disclosed evidence must establish that, notwithstanding the late disclosure, the other party had enough evidence to reasonably assess settlement, to avoid trial by ambush, and to prepare rebuttal to expert testimony.

*In re D.W.G.K.¸* 558 S.W.3d at 680. RCIS argues that because Houser failed to produce documents related to its claim for attorney fees *before trial*, it was unable to rebut Houser's expert testimony, and because the billing records produced disclosed nothing about the persons

listed on them (e.g., whether they were attorneys or paralegals), it was unable to properly evaluate whether the attorney fees were reasonable and necessary.

However, as Houser's counsel pointed out at the attorney fees hearing, if Houser had produced documents on February 9, RCIS would have received them about eight weeks before trial, but because the majority of work performed in the case occurred after that time, the records would have shown only about one-quarter of the work that was performed through the end of trial.[18]  Further, because Houser produced the billing records with its motion to reopen evidence on April 27, RCIS received billing records about eight weeks before the hearing on attorney fees, except these records showed *all* the work performed through the end of the trial on the substantive trial.  Also, although the billing records did not state which persons performing work were paralegals or attorneys, it did state the work performed and the hourly rates of those persons, and it contained several entries by an attorney for work done at a paralegal rate.  As a result, the trial court could have determined that RCIS had enough information to cross-examine Houser's expert regarding the rates charged and the experience of the persons shown on the billing records.

On this record, the trial court could have reasonably concluded that, because RCIS had the same amount of time to prepare for the cross-examination of Ensley at the attorney fees hearing after it received the billing records and Ensley's affidavit as it would have had to prepare for Ensley's cross-examination at trial, but with less information had the documents been produced on February 8 and supplemented a few weeks later, RCIS was not unfairly prejudiced

---

[18]Houser's attorney also stated that even if these records had been supplemented at the end of the discovery period, they would have contained only about one-third of the total work that was performed through trial.

by Houser's untimely production of the attorney-fee evidence. As a result, we find that the trial court did not abuse its discretion in admitting the evidence. We overrule this issue, in part.

**B.      The Award of Attorney Fees Must Be Remanded for a New Trial**

RCIS also complains that the trial court erred because the attorney fees award is excessive in relation to the damages recoverable by Houser, and it asks us to remand the case for a new trial to determine any attorney fees to be awarded to Houser. In this case, the trial court's final judgment is based on Houser prevailing on its contract claims against RCIS regarding the Leonard Project, and awarded Houser all of its requested damages, being actual damages of $78,491.10 and prompt payment interest of $33,423.65, for a combined total of $111,914.75. The trial court also awarded Houser $114,896.08 in attorney fees. We have determined that Houser released its claim to $56,500.00 of the awarded actual damages and failed to show its entitlement to prompt payment interest. Striking these amounts from the trial court's judgment results in actual damages of $21,991.10, and prompt payment interest of $0.00.

The results obtained by the prevailing party is one of the factors that Texas courts take into consideration when awarding attorney fees. In *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, the Texas Supreme Court stated:

> In Texas courts, the base lodestar calculation of reasonable hours times a reasonable rate should account for any results obtained up to trial. But to the extent that the results obtained are not reflected in the base lodestar, then the fact finder may determine whether the results obtained consideration necessitates an adjustment to achieve a reasonable fee under the second step of the lodestar method.

*Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 500 n.12 (Tex. 2019). The Texas Supreme Court has also held that when a court of appeals substantially reduces the trial

court's damages award, an award of attorney fees based in part on the results obtained may be harmful error:

> Not every appellate adjustment to the damages which a jury considered as "results obtained" when making attorney's fees findings will require reversal. In this case, however, considering both the absolute value of the difference between the erroneous and correct amounts of damages, and the fact that the correct damages were one-seventh of the erroneous damages, we are not reasonably certain that the jury was not significantly affected by the error. Accordingly, the trial court's error was harmful.

*Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006).

Likewise, in this case, there is a substantial difference between the erroneous and correct amounts of damages, and the correct damages are less than one-fifth of the erroneous damages. As a result, we are not reasonably certain that the trial court was not significantly affected by the error, and we find that the amount of attorney fees awarded by the trial court was harmful error. *See id.* Accordingly, we sustain this issue, in part, and we will remand the case to the trial court for a new trial as to attorney fees. *See id.* at 315.

## V. Disposition of Interpleaded Funds

In its fifth issue, RCIS challenges the trial court's order releasing the funds interpleaded by Garney to Houser, and it asks us to direct the trial court on remand to order Houser to return the released funds to the registry of the court. The trial court's judgment ordered the clerk of the court to release the interpleaded funds to Houser, and provided that upon release of the funds that Houser "issue a credit in favor of [RCIS] against the Final Award, applied first against the principal damages award and thereafter against all other amounts awarded to [Houser]."

"[F]unds deposited in the trial court's registry are subject to the trial court's control, and the court has the equitable power to make such orders as it deems necessary to protect those funds." *In re Scott Pelley, P.C.*, No. 05-21-00314-CV, 2021 WL 3891595, at *5 (Tex. App.—Dallas Aug. 31, 2021, orig. proceeding) (mem. op.) (alteration in original) (quoting *Sommers v. Concepcion*, 20 S.W.3d 27, 36 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)).  In this appeal, we have substantially reduced the damages award, and we have remanded the award of attorney fees for a new trial.  Because the attorney fees award is undetermined, we are unable to determine whether any of the released funds should be returned to the registry of the court.

As a result, we overrule this issue.  That being said, because this case is being remanded, the trial court may exercise its equitable powers to make such "further orders as it deems necessary to protect the interpleaded funds." *US MCT, Inc. v. Brodsky*, No. 05-98-00204-CV, 2001 WL 1360301, at *9 (Tex. App.—Dallas Nov. 7, 2001, no pet.) (not designated for publication).

## VI.    Disposition

For the reasons stated, we affirm, in part, reverse and render, in part, and reverse and remand, in part.  We affirm the trial court's judgment that Houser is entitled to damages.  We reverse, in part, the trial court's judgment awarding Houser $78,491.10 in actual damages and render judgment for $21,991.10 in actual damages.  We reverse, in part, the trial court's judgment awarding Houser $33,423.65 in prompt payment interest and render judgment for $0.00 in prompt payment interest.  We reverse, in part, the trial court's judgment awarding Houser $114,896.08 in attorney fees and remand this case for a new trial on attorney fees, a

34

determination of prejudgment interest, if any, to make such further orders as it deems necessary to protect the interpleaded funds, and to enter a final judgment consistent with this opinion.


Jeff Rambin
Justice

Date Submitted:     October 03, 2024
Date Decided:      January 30, 2026